.Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc., etc., demandantes y recurridos, v. Dra. Ivette Morales y el Colegio de Optómetras de Puerto Rico, demandados y recurrentes, Academia Puertorriqueña de Oftalmología, Inc. y la Junta Examinadora de Optómetras de Puerto Rico, interventores y recurrentes, y Tribunal Examinador de Médicos de Puerto Rico, recurrente.

*Números:* CE-89-622
CE-89-651

*Resueltos:* 1ro de febrero de 1993

*Fermín M. Fracinetti Rivas*, de *Fracinetti & Archilla*, abogado del Colegio de Optómetras de Puerto Rico, recurrente; *Marcos Pérez Cruz*, de *Marcos Pérez Cruz Law Offices*, abogado de la Dra. Ivette Morales, recurrente; *Antonio Fernós López-Cepero*, abogado de la Academia Puertorriqueña de Oftalmología, Inc., recurrente; *César J. Dones Magáz*, abogado de la Junta Examinadora de Optómetras de Puerto Rico, recurrente; *Abrahán Díaz González*, abogado del Tribunal Examinador de Médicos de Puerto Rico, recurrente; *Héctor M. Collazo Maldonado*, abogado de la Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc., recurrida; *Demetrio Fernández*, abogado de la Asociación Médica de Puerto Rico, Inc., y *Jorge Pérez Díaz, Procurador General*, y *Sylvia Cancio Bigas, Procuradora General Auxiliar*, abogados del Secretario de Salud de Puerto Rico, ambos como *amicii curiae*.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

Recurren ante nos el Tribunal Examinador de Médicos de Puerto Rico (en adelante T.E.M.), la Academia Puertorriqueña de Oftalmología, Inc., la Junta Examinadora de Optómetras de Puerto Rico y los demandados doctora Morales y el Colegio de Optómetras de Puerto Rico de una

sentencia del Tribunal Superior, Sala de San Juan, que revocó el dictamen del T.E.M., el cual sostuvo que los médicos generalistas no estaban facultados ni adiestrados para realizar exámenes de refracción visual y expedir recetas de espejuelos o lentes, y que cualquier actuación de este tipo sería una violación de la ley que regula la práctica de la medicina. Consolidadas las peticiones de *certiorari*, y con el beneficio de los alegatos de las partes, la prueba que obra en autos y las comparecencias de la Asociación Médica de Puerto Rico, Inc. y del Secretario de Salud, quienes a solicitud de este Foro comparecieron como *amicii curiae*, procedemos a resolver.

La controversia presente puede ser sintetizada de la siguiente forma: ¿Están los médicos generalistas (médicos-cirujanos), en virtud de las leyes especiales que rigen la materia,(1) autorizados a realizar exámenes de refracción de la vista y a recetar lentes correctores al igual que los optómetras y médicos-oftalmólogos? Luego de un análisis cuidadoso y sosegado de los extensos escritos sometidos ante nos, resolvemos que no lo están. Así lo sostienen todas las partes que han comparecido ante nos, salvo la Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc.

I

La recurrida Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc. y los doctores miembros de la Asociación, incoaron una demanda en daños y perjuicios contra el Colegio de Optómetras de Puerto Rico y su presidenta, Dra. Ivette Morales, por causa de una alegada campaña de difamación en su contra realizada por dicho

---

(1) Ley de Optometría, Ley Núm. 80 de 26 de junio de 1964, según enmendada, 20 L.P.R.A. sec. 531 y ss., y ley habilitadora del Tribunal Examinador de Médicos, Ley Núm. 22 de 22 de abril de 1931, según enmendada, 20 L.P.R.A. secs. 31–52d.

Colegio. Alegaron que la campaña difamatoria consistió en la denuncia pública realizada por el Colegio de Optómetras de Puerto Rico respecto a que los médicos de la mencionada asociación estaban haciendo exámenes de refracción de la vista, recetando espejuelos y anunciándose como especialistas (oculistas, especialistas en salud visual) sin autoridad en ley para ello. Luego de varios trámites iniciales ante el Tribunal Superior, Sala de San Juan, el tribunal paralizó el caso y refirió el asunto ante el T.E.M. en virtud del planteamiento de jurisdicción primaria presentado por la parte demandada.

El 13 de enero de 1986, el T.E.M. determinó su jurisdicción sobre la controversia de autos y emitió una resolución a los efectos de delimitar las controversias bajo su consideración. Determinó que las controversias que habrían de resolverse por dicho foro serían las siguientes:

> 1. Si los médicos cirujanos que hagan exámenes de refracción y que expidan recetas de espejuelos o lentes, están o no facultados, en virtud de su licencia, a realizar tales exámenes y a expedir tales recetas.
> 2. Si los médicos cirujanos que han estado realizando exámenes de refracción y recetando espejuelos o lentes, han violado o violan el Artículo 9 o el Artículo 17 de la Ley Núm. 112 del 4 de junio de 1980, según enmendada[, sobre la prática legal de la medicina al anunciarse como especialistas y ejercer como tales]. Apéndice VIII, págs. 1–2.

A esos efectos, el T.E.M. celebró la correspondiente vista administrativa con la participación de la demandante Asociación de Doctores en Medicina al Ciudadano de la Salud Visual, Inc., la demandada Colegio de Optómetras de Puerto Rico y la interventora Academia Puertorriqueña de Oftalmología, Inc.[2]

La vista comenzó el 4 de noviembre de 1986 con la presentación del testimonio del oftalmólogo perito Dr. Vicente

---

[2] La Academia Puertorriqueña de Oftalmología, Inc. fue admitida como parte interventora por el Tribunal Superior.

Alcaraz, Presidente de la Academia Puertorriqueña de Oftalmología, Inc. por parte de estos interventores. *En síntesis, éste atestó que durante sus cuatro (4) años de medicina general no se le preparó para hacer exámenes de refracción de la vista y recetar lentes.* Que no fue hasta su segundo año de estudio de especialidad y residencia en oftalmología que comenzó a hacer exámenes de refracción. *Que a los estudiantes de oftalmología se les requiere realizar un mínimo de mil quinientos (1,500) exámenes de refracción como requisito de graduación,* conforme a las especificaciones de la Junta Acreditadora de la Escuela de Oftalmología. *Exhibit* V, págs. 16–20. Finalmente, atestó que el estudio de la refracción no constituye parte del estudio básico de la carrera de medicina, que se trata de un área en la que *la práctica bajo supervisión es fundamental para adquirir los conocimientos y destrezas adecuados, y sobre la necesidad de que el profesional que realiza el examen, a la hora de hacer la receta para los espejuelos, pueda discernir sobre la condición del paciente más allá de los resultados o lecturas que ofrecen los instrumentos especializados diseñados a esos fines.* Íd., págs. 23–32. Sobre esto último, puntualizó que, si bien los instrumentos técnicos y computadorizados son de gran ayuda para el oftalmólogo a los fines de determinar la condición del paciente, es responsabilidad del especialista el refinar los resultados obtenidos acorde con su pericia. Destacó que en su caso, no había habido una sola receta ofrecida por el equipo a la cual él no le hubiese hecho alguna variación. Íd., pág. 31.

En el contrainterrogatorio al que fuera sometido por el abogado de la demandante, el doctor Alcaraz insistió en su testimonio. Atestó sobre la importancia cardinal de tener un adiestramiento médico para hacer un examen del ojo y de la vista en ciertas circunstancias, pero negó que fuera una condición suficiente para el buen ejercicio de la práctica de exámenes de refracción y receta de espejuelos. Atestó que la carrera médica capacita al estudiante para

hacer un examen general *del ojo pero no de la visión*, y que el grueso de los estudiantes durante la residencia no rota por oftalmología. Finalmente, aceptó que el entrenamiento sobre cómo utilizar el autorefractor que actualmente posee se lo brindó el propio vendedor, pero insistió en que es necesario suplementar los resultados ofrecidos por las máquinas con el *expertise* profesional. Esto es así dado que los resultados brindados por la máquina pueden variar por infinidad de circunstancias no relacionadas a la condición visual del paciente.

Los procedimientos ante el T.E.M. continuaron el 13 de noviembre de 1986. En esta ocasión testificó el Dr. Raúl Marcial Rojas, Decano de la Escuela de Medicina y Presidente de la Universidad Central del Caribe. Éste atestó sobre el currículo de estudio de la facultad de medicina de la universidad que preside, la Universidad de Puerto Rico, donde fue profesor, y de otras en Estados Unidos. Para esto se fundamentó en documentos de la Asociación Americana de Colegios de Medicina y del Comité de Enlace para la Educación Médica de Estados Unidos, los cuales fueron admitidos en evidencia. Transcripción de la vista administrativa, págs. 35 y 36, estipulado de 4 de diciembre de 1986, T.V.A., pág. 3.

Al igual que el doctor Alcaraz, el perito Dr. Marcial Rojas atestó que el currículo de medicina general *no incluye el estudio de las materias constitutivas de la especialidad de la oftalmología*. Declaró que sólo nueve (9) de las ciento veintisiete (127) facultades de medicina acreditadas en todo Estados Unidos ofrecen un curso independiente de oftalmología, de las cuales la mayor parte (98%) lo configuran como un curso lectivo (sin práctica) de ocho (8) horas. *Exhibit* VI, pág. 23. Declaró que entre los exámenes del ojo que aprende a realizar el estudiante en estos cursos no se incluye el examen de refracción de la vista. Señaló que existen otras siete (7) escuelas que enseñan oftalmología dentro de un bloque multidisciplinario en las que, por

ejemplo, en el caso de la Escuela de Medicina de la Universidad de Puerto Rico, se expone al estudiante a diez (10) subespecialidades, entre las cuales se encuentra oftalmología, dentro de un término de ocho (8) semanas. *Exhibit* VI, págs. 23–24. Añadió que durante el internado, el estudiante, mientras rota o hace pasantías por distintas especialidades, rara vez atiende o realiza exámenes de la vista "por que no se hospitaliza a pacientes por problemas visuales nada más". *Exhibit* VI, pág. 29. Puntualizó que cada vez más la educación médica va dirigida a brindarle al estudiante una formación básica que lo capacite para continuar estudios especializados. Así también, que el estudiante adquiere unos conocimientos mínimos sobre la anatomía, fisiología y patología del ojo, pero no adquiere un conocimiento teórico real sobre problemas visuales de refracción y mucho menos adquiere destrezas prácticas para ir a evaluar los errores de refracción de los pacientes. *Exhibit* VI, págs. 32–34. Señaló que definitivamente no se le adiestra para realizar un examen de refracción. *Exhibit* VI, pág. 45. Atestó que los términos "oculista" y "oftalmólogo" son sinónimos.

*En el contrainterrogatorio reafirmó que, a su entender como educador, el graduado de medicina no está capacitado para atender responsablemente a un paciente sin supervisión. Exhibit VI, pág. 65.* Admitió que los exámenes de refracción son un procedimiento que no plantea mayores riesgos, aunque un diagnóstico equivocado podría plantear problemas serios a largo plazo. *Exhibit* VIII, pág. 72. Finalmente, puntualizó que de nada vale obtener cursos de educación continuada en un área si no se tienen las bases para poder entender y poner al día esos conocimientos. *Exhibit* VIII, págs. 126–131.

Surge del récord administrativo *que se estipuló por las partes, que los decanos de las otras dos (2) facultades de medicina acreditadas en Puerto Rico por el Comité de Enlace para la Educación Médica, el doctor Méndez de la Uni-*

*versidad de Ponce y la Doctora De Jesús de la Universidad de Puerto Rico, declararían lo mismo que el perito Dr. Marcial Rojas.* La Academia Puertorriqueña de Oftalmología, Inc. presentó y ofreció el testimonio de ambos decanos, como prueba acumulativa, que no fue contrainterrogada, estipulándose su contenido. Resolución del Tribunal Examinador de Médicos Núm. 88-1 de 27 de enero de 1988, pág. 3, Apéndice VIII, pág. 3.

Por su parte, la demandante Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc. procedió con su desfile de prueba en una vista celebrada el 15 de enero de 1987. Presentó como primer testigo a la Dra. Isabel Lebrón Lugo, especialista en Medicina de Familia. Surge de la resolución del T.E.M. que ésta atestó que durante sus primeros cuatro (4) años de estudios en la Facultad de Medicina del Recinto de Ciencias Médicas de Río Piedras, tuvo la oportunidad de relacionarse y aprender a hacer exámenes de refracción, y que había practicado personalmente varios exámenes de refracción durante esos años de estudios. La testigo presentó evidencia documental referente a aquellos cursos relacionados con la enseñanza y práctica de la oftalmología, que alegadamente incluyen el estudio y la práctica de exámenes de refracción, aunque no pudo precisar los nombres de los profesores que le enseñaron ni aquellos bajo cuya supervisión practicó exámenes de refracción. Declaró haber tomado tanto el curso básico *Ophtalmology*, así como un electivo adicional *Clinical Ophtalmology.* Se estipularon como *exhibit* el récord académico completo y la transcripción de créditos de la Dra. Isabel María Lebrón Lugo. Transcripción de la vista administrativa, págs. 60 y 90–91, 13 de enero de 1987. *No obstante, el T.E.M., antes del análisis del currículo de la Escuela de Medicina de la Universidad de Puerto Rico, determinó que el curso de "Clinical Ophtalmology" no incluye refracción en su aspecto teórico ni en su aspecto práctico.*

Por otro lado, la doctora Lebrón Lugo declaró que posee

conocimientos en refracción derivados de los libros de texto asignados por sus profesores en diversos cursos sobre anatomía, fisiología y fisiopatología, y *que ella leyó por su cuenta. Exhibit* V, págs. 62–66 y 68–70.

Finalmente, la testigo demostró que tiene conocimiento preciso de todos y cada uno de los instrumentos que se utilizan para llevar a cabo refracciones e indicó haber realizado alrededor de nueve mil ochocientos treinta y cinco (9,835) exámenes de refracción durante su carrera. Admitió, no obstante, haberlos realizado luego de graduada mientras trabajaba para la Óptica Lee Borinquen en Bayamón. Insistió, sin embargo, haber adquirido los conocimientos necesarios para realizar el examen de refracción en los primeros cuatro (4) años de su carrera de medicina, y que fue en ese período que se relacionó con todos y cada uno de los instrumentos que se utilizan para el examen. Apéndice VIII, pág. 6. Su testimonio directo fue debilitado a consecuencia del contrainterrogatorio al que fue sometida, particularmente por su denotada falta de recuerdo sobre los nombres o la descripción física de los profesores y residentes de oftalmología bajo cuya supervisión alegó haber realizado refracciones.

Además del testimonio de la doctora Lebrón Lugo, la Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc. ofreció los testimonios de los siguientes doctores: Vlamir de Brito, Segundo González, Víctor Zapata, Federico Decoudray, Pedro Pérez y Milagros Torres Colón, todos graduados de universidades extranjeras. El testimonio de estos médicos corroboró, en parte, lo alegado por la doctora Lebrón Lugo, en el sentido de que la refracción es una materia que se aprende y se realiza durante los primeros cuatro (4) años de estudios de medicina y que ellos adquirieron la preparación necesaria para realizar los exámenes de refracción y recetar espejuelos durante sus años de estudio de medicina general, y no al comenzar a trabajar

para las distintas ópticas en Puerto Rico para las cuales trabajan.

Así quedó sometida la controversia ante el T.E.M. *La Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc. no presentó testimonio pericial alguno en materia de educación médica o curricular, por lo cual el testimonio de los decanos peritos de las escuelas de medicina quedó como no controvertido y mereció gran peso al T.E.M.* Apéndice VIII, pág. 21. Asimismo, los documentos sometidos por estipulación, los cuales presentan el criterio del Comité de Enlace para la Educación Médica.

El 27 de enero de 1988, el T.E.M. emitió su resolución Núm. 88-1 para resolver que los médicos generalistas no estaban facultados ni adiestrados para realizar exámenes de refracción y expedir recetas de espejuelos o lentes, y que cualquier actuación de este tipo sería una violación de la ley que regula la práctica de la medicina. Concluyó también que durante los cuatro (4) años básicos de estudio de medicina no se ofrece dicho adiestramiento y educación. El T.E.M. señaló que la refracción es un campo especializado que sólo se estudia por los médicos como parte del currículo de la especialidad en oftalmología, por lo que son estos especialistas los únicos *médicos* preparados para realizar exámenes de refracción en un paciente. Por tales razones, resolvió que los demandantes y aquellos médicos en iguales condiciones debían abstenerse de continuar la práctica de la oftalmología y de anunciarse como especialistas en el área de la visión o como oculistas.

De la anterior decisión acudieron en revisión judicial ante el Tribunal Superior la Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc. y los médicos que la componen. Una vez sometido el caso, se solicitó la intervención por la peticionaria, Junta Examinadora de Optómetras de Puerto Rico. Concluidos los trámites, el foro judicial inexplicablemente dictó sentencia para revocar la

resolución del T.E.M. Señaló el tribunal que la decisión del T.E.M. no establece los fundamentos por los cuales un médico generalista no puede aprender de otra forma que no sean los estudios de oftalmología, las destrezas necesarias para hacer exámenes de refracción. Resolvió que el hacer un examen de refracción en el ojo de un paciente por un médico es un acto que está dentro del ejercicio de la medicina, independientemente de que este tipo de examen también esté reglamentado por la ley que rige el ejercicio de la optometría. Descartó la determinación del T.E.M. de que los médicos generalistas sólo pueden examinar pacientes para determinar cualquier condición patológica en el ojo y que luego tenían que referir el paciente a un oftalmólogo, señalando que a la luz de tal razonamiento sólo los especialistas podrían tratar pacientes, lo que entendió sería totalmente inaceptable. Finalmente, resolvió que existía una "total ausencia, tanto en el récord administrativo del caso como en el texto de la decisión del TEM objeto del recurso, de dato alguno que [pudiera] siquiera sugerir que el examen de refracción es tan difícil que ningún médico generalista puede aprender cómo hacerlo correctamente sin antes hacer una residencia de varios años en oftalmología ...". *Exhibit* I, pág. 9. Por tales razones, resolvió que la decisión del T.E.M. no se podía sostener al ser tan arbitraria e irrazonable que representaba un claro abuso de discreción.([3]) *Exhibit* I, pág. 13.

---

([3]) La Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc., en una ponencia de 15 de mayo de 1985 presentada ante las Comisiones de Salud y Bienestar y de Gobierno de la Cámara de Representantes de Puerto Rico que obra en autos, sostuvo que en Estados Unidos la proporción recomendada en dicho año de optómetras y oftalmólogos era de 14.3 por cada cien mil (100,000) habitantes. Al 20 de noviembre de 1992, según datos del Departamento de Salud y de la Junta Examinadora de Optómetras, existen en Puerto Rico ciento dieciocho (118) oftalmólogos activos y trescientos cincuenta y dos (352) optómetras. Ello hace una proporción de 13.43 por cada cien mil (100,000) habitantes, tomando como base una población total de 3.5 millones de habitantes. Además, la Escuela de Optómetras de la Universidad Interamericana (la única que hay en Puerto Rico) gradúa anualmente un promedio de veinticinco (25) a treinta (30) optómetras.

## II

Unas breves palabras sobre lo que es la capacidad refraccionaria del ojo y la corrección de sus defectos.

La refracción es la desviación que se produce en la dirección de un rayo luminoso cuando pasa oblicuamente de un medio a otro de diferente densidad. Dorland, *Diccionario de Ciencias Médicas*, 6ta ed., Buenos Aires, Ed. El Ateneo, 1979, pág. 1261. En el ojo, este proceso hace posible la formación de imágenes de los objetos externos sobre la retina, creando así la visión. El término también se utiliza para describir el procedimiento mediante el cual se mide el poder de refracción del ojo, esto es, la habilidad del ojo para desviar rayos lumínicos. Una persona adiestrada en refracción debe poder determinar la causa de la incapacidad de un ojo de desviar los rayos de luz correctamente y conocer cómo corregir dichos defectos (si es posible) mediante los lentes apropiados. 6 *Lawyers' Medical Cyclopedia* Sec. 39.2, pág. 4 (ed. rev.). El examen de la capacidad refraccionaria del ojo y la corrección de los defectos de refracción constituyen la médula de la práctica de la *optometría.*

■ En Puerto Rico la práctica de la optometría se encuentra regulada por la Ley Núm. 80 de 26 de junio de 1964 (20 L.P.R.A. sec. 531 y ss.). Ésta define la optometría de la manera siguiente:

(a) "Optometría" es el examen de la vista mediante el empleo de cualquier medio objetivo o subjetivo *sin el uso de drogas, medicinas o cirugía a los fines de descubrir y determinar los defectos visuales acomodativo o muscular* [sic] *de los mismos*, bien midiendo su alcance en relación con el grado normal de visión *como prescribiendo ejercicios, lentes con o sin foco y/o cristales oftálmicos, prismas, ejercicios musculares, así como cualquier principio, método o aparato legítimo para atención, tratamiento o corrección de las dichas deficiencias, y la confección y dispendio de los artefactos correctivos y protésicos* para la corrección de defectos visuales. (Énfasis suplido.) 20 L.P.R.A. sec. 531(a).

El artículo vigente al momento de instado este pleito requería de toda persona que aspirase a ejercer la optometría en Puerto Rico el cumplir con los requisitos de haber obtenido el diploma de escuela superior y el diploma de optómetra adquirido en escuela, colegio o universidad reconocida por la Junta Examinadora de Optómetras creada por ley, cuyo curso de estudio *no sea menor de cuatro (4) años (tres mil (3,000) horas de asistencia personal a clase)* en las materias constitutivas del área de la optometría, 20 L.P.R.A. sec. 538. Entre éstas se encuentran la óptica teórica, óptica práctica, óptica fisiológica, optometría teórica, optometría práctica, lentes de contacto, farmacología y anatomía, y fisiología del ojo con estados patológicos relacionados con la optometría, 20 L.P.R.A. sec. 539. No se admiten los diplomas de estudios hechos por correspondencia, 20 L.P.R.A. sec. 538.[4] Además de estos estudios, se requiere la aprobación de un examen de reválida en optometría, el cual consiste de una parte teórica sobre las materias arriba mencionadas y de un examen práctico consistente en el manejo de los aparatos e instrumentos empleados en la optometría y en el examen y diagnóstico de un caso, 20 L.P.R.A. sec. 539.

Como puede apreciarse, se desprende claramente del estatuto la determinación del legislador de que para el sano ejercicio de la práctica de la optometría es necesario que el aspirante haya adquirido destrezas, tanto teóricas como prácticas, en el área de la optometría bajo supervisión académica y que posteriormente acredite el dominio de tales

---

[4] Mediante La Ley Núm. 29 de 7 de agosto de 1990 (20 L.P.R.A. secs. 531(c)–(e), 532–534, 535(b), (f) e (i), 536 y 538–539) se *aumentaron* los requisitos de ley para ser admitido a la práctica de la optometría, requiriéndose los siguientes estudios previos a la reválida:

(a) Diploma de doctor en optometría obtenido de una escuela, colegio o universidad que conceda el título de Doctor en Optometría y que se halle reconocida por la Junta Examinadora de Optómetras, cuyo curso conste de cuatro (4) años de estudios optométricos. No se admitirán los diplomas por correspondencia.

(b) Evidencia de haber cursado estudios de preoptometría cuyo curso conste de un mínimo de noventa (90) créditos a nivel universitario.

destrezas. No son livianos estos requisitos impuestos por el legislador a quienes aspiran a ejercer la optometría en Puerto Rico. Así surge además del historial legislativo referente a la aprobación del estatuto y de las enmiendas recientes. Véanse: 18 Diario de Sesiones de la Asamblea Legislativa (Ordinaria), T. 4, págs. 1840–1841, 1985, 1990–1991 y 2049 (1964); Exposición de Motivos de la Ley Núm. 29 de 7 de agosto de 1990, Leyes de Puerto Rico, pág. 113.

Ahora bien, la ley que regula la optometría contiene la *cláusula de salvedad* siguiente:

> Las disposiciones de las secs. 531 a 543 de este título no afectarán a los *médicos cirujanos* debidamente autorizados para ejercer la profesión *médica* en Puerto Rico *ni a los optómetras que con anterioridad a la aprobación de esa ley obtuvieron licencia para la práctica de la optometría en esta jurisdicción.* (Énfasis suplido.) 20 L.P.R.A. sec. 542.

Sostiene la recurrida Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc., y concluyó el tribunal de instancia, que esta disposición estatutaria tiene el efecto de excluir a los médicos autorizados a practicar su profesión en Puerto Rico, sin distinción de clase alguna, de las disposiciones de la ley. Sostiene, además, que su alcance es el de excluir a los médicos-cirujanos del requisito de establecer su pericia como optómetras, es decir, que no necesitan acreditar su capacidad para realizar exámenes de refracción y recetar espejuelos una vez licenciados como médicos en Puerto Rico. Alegato de los demandantes-recurridos Asociación de Doctores en Medicina al Cuidado de la Salud Visual, Inc.; etcétera, pág. 12. Se equivoca.

■ Es un principio básico en materia de interpretación estatutaria el que para determinar el alcance de alguna parte de un estatuto deberá considerarse el estatuto en su totalidad. *Sales v. Samac Motor Corp.*, 92 D.P.R. 529 (1965); *Delgado v. D.S.C.A.*, 114 D.P.R. 177 (1983); *A.R.P.E.*

*v. Ozores Pérez*, 116 D.P.R. 816 (1986). R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 315. Deberán interpretarse sus secciones las unas en relación con las otras como que forman parte de un todo armónico. *Pueblo v. Pérez Escobar*, 91 D.P.R. 10 (1964); *Orta v. Registrador*, 60 D.P.R. 789, 793 (1942); *Martínez Reyes v. Tribunal Superior*, 104 D.P.R. 407, 410–411 (1975); *Cardona v. Depto. Recreación y Deportes*, 129 D.P.R. 557 (1991). De esta manera debemos interpretar la referida cláusula de salvedad contenida en la Ley Núm. 80, *supra*.

El Art. 1 de la Ley Núm. 80, *supra*, 20 L.P.R.A. sec. 531, establece *que constituirá evidencia prima facie de práctica ilegal de la optometría* la presencia de cualquier material oftálmico y/o instrumental para examinar la vista en poder de cualquier persona natural o jurídica *que no sean oftalmólogos, oculistas u optómetras*([5]) *o en el caso de un técnico debidamente supeditado a un oftalmólogo, oculista, u optómetra. Como puede apreciarse, el legislador no incluyó a los médicos-cirujanos entre aquellos presumiblemente autorizados a practicar la optometría. No creemos que mediante la referida cláusula de salvedad el legislador intentó suplir esta omisión cuando pudo haberlo hecho en el texto claro y expreso del estatuto.*

Un examen del historial legislativo revela que el proyecto de ley originalmente sometido a la consideración de

---

([5]) Se conoce como optómetra al profesional que, cumpliendo con las disposiciones de este capítulo, se encuentra debidamente licenciado a ejercer la optometría. El optómetra no es un médico, por lo cual no está capacitado ni autorizado a recetar drogas ni a intervenir quirúrgicamente en el ojo. Por su parte, el oftalmólogo es un médico-cirujano que además ha completado estudios especializados en oftalmología en una universidad acreditada. Durante estos estudios cumple al menos un (1) año de internado realizando cirugía, diagnóstico y tratamiento de enfermedades del ojo y se adiestra en la práctica de la refracción. "Oculista" es el término en desuso por el cual se conocía al médico con una especialización en oftalmología años atrás, es decir, al oftalmólogo. 6 *Lawyers' Medical Cyclopedia* Sec. 39.2 (ed. rev.).

la Asamblea Legislativa, P. del S. 551, leía en su parte pertinente de la forma siguiente:

> Artículo 12.—Cláusula de Salvedad.
> Las disposiciones de esta ley no afectarán a los médicos ciru-janos debidamente autorizados para ejercer la profesión en Puerto Rico ni a los optómetras que con anterioridad a la apro-bación de esta ley obtuvieron licencia para la práctica de la profesión en Puerto Rico. Diario de Sesiones, *supra*, pág. 1824.

Fue a recomendación de la Comisión de Salud y Benefi-ciencia que se enmendó el proyecto original para añadir la palabra *médica* luego de la palabra *profesión*, en la refe-rida cláusula de salvedad. Diario de Sesiones, *supra*, pág. 1840. Dicha aclaración, analizada en el contexto general del estatuto, revela que la intención del legislador fue es-pecificar que la aprobación del estatuto no afectaría ni im-pondría limitaciones a la práctica de la medicina propia-mente y que, por otro lado, los optómetras no tendrán más facultades en cuanto al examen del órgano visual que las especificadas en la ley, sin poder incursionar en cuanto al examen del ojo en el área de la medicina.

■ Más aún, es principio reconocido que al interpretar una ley hay que tomar en consideración otras leyes o dis-posiciones *in pari materia* o complementarias que puedan ayudar a esclarecer la verdadera intención legislativa. Có-digo Civil de Puerto Rico, Art. 18 (31 L.P.R.A. sec. 18).[6] Véanse: *Zambrana Maldonado v. E.L.A.*, 129 D.P.R. 740 (1992); *Pueblo v. Pizarro Solís*, 129 D.P.R. 911 (1992); *Car-dona v. Depto. Recreación y Deportes*, supra; *Beauchamp v. Holsum Bakers of P.R.*, 116 D.P.R. 522 (1985).

■ A tales efectos resultan claramente pertinentes y reveladoras a la controversia de autos las disposiciones de

---

[6] Lee el Art. 18 del Código Civil, 31 L.P.R.A. sec. 18:
"Las leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro."

la Ley Núm. 152 de 3 de junio de 1976, según enmendada, 20 L.P.R.A. sec. 2751 y ss., que regula la profesión óptica en Puerto Rico. Dicho estatuto define al *óptico* como la persona que se dedica a la preparación de lentes oftálmicos con o sin focos, espejuelos, anteojos o sus accesorios, mediante recetas escritas expedidas por *oftalmólogos u optómetras* debidamente autorizados a ejercer su profesión, y considerando tales recetas escritas, mide los contornos faciales del paciente o cliente y talla, corta y monta cristales oftálmicos, que lleve la receta de *médico-oftalmólogo u optómetra* para determinar el tamaño y la forma de la montura y los lentes que mejor se ajusten a las necesidades físicas de dicha persona, 20 L.P.R.A. sec. 2751.

■ El médico generalista (médico-cirujano) tampoco se encuentra dentro de la enumeración de esta ley como uno de aquellos profesionales de la salud de quienes está facultado el óptico para recibir recetas escritas de lentes para la preparación y el ajuste de espejuelos a personas con problemas visuales. La ley autoriza al óptico taxativamente a recibir recetas escritas por parte de *oftalmólogos* u *optómetras* debidamente autorizados a ejercer su profesión o a hacer duplicados, reparaciones y repeticiones de lentes sin necesidad de nueva receta. 20 L.P.R.A. sec. 2751.

No podemos concluir que se trata de una doble omisión por inadvertencia del legislador cuando éste ha gozado de plenas oportunidades para subsanarlas.[7] Aun cuando así fuera, no nos corresponde suplirla en estas circunstancias. Véase Bernier y Cuevas Segarra, *op. cit.*, pág. 311.

■ No le asiste razón a la recurrida en su interpretación de la referida cláusula de salvedad. La ley de optome-

[7] En fechas recientes, tanto la Ley de Optometría como la que regula la práctica de la óptica han sido objeto de enmiendas substanciales por parte de la Asamblea Legislativa y nada se ha dispuesto al respecto. Véanse las Leyes Núm. 29, *supra*, y Núm. 82 de 1ro de septiembre de 1990 (20 L.P.R.A. secs. 2751(a) y (c)–(g), 2752, 2753(a), (c) y (e)–(j), 2754(a)(1), 3, 2756–2756a, 2757(a)(9) y (c), 2758, 2759 y 2760), respectivamente.

tría no presume, reconoce ni establece la pericia del médi-
co- cirujano para ejercer dicha profesión.

Al ser ello así, es necesario examinar si su licencia de
médicos los autoriza a practicar tal profesión. Veamos.

## III

Al amparo de la legislación que rige la profesión médica
en Puerto Rico, ¿están capacitados los médicos cirujanos o
generalistas para realizar exámenes de refracción visual y
recetar espejuelos? Esta fue la controversia sometida ante
la consideración del T.E.M., el cual luego de examinada la
prueba desfilada resolvió en la negativa.

Actualmente no se discute la extensa discre-
ción del Estado y sus juntas examinadoras en la fijación de
las normas y los procedimientos que han de regir los pro-
cesos de admisión o certificación de personas al ejercicio de
la profesión u oficios. *Román v. Trib. Exam. de Médicos*,
116 D.P.R. 71, 79 (1985); *Pérez v. Junta Dental*, 116 D.P.R.
218, 233 (1985); *Santiago v. Trib. Exam. de Médicos*, 118
D.P.R. 1, 5 (1986). El derecho que tiene toda persona a
ejercer una profesión o negocio no es absoluto, sino que
está subordinado a los requisitos y las condiciones que ra-
zonablemente imponga la Asamblea Legislativa en el ejer-
cicio del poder regulador que tiene para beneficio de la
comunidad. *Infante v. Junta de Médicos Exam. de P.R.*, 43
D.P.R. 325, 330 (1932); *Pérez v. Junta Dental*, supra. Seme-
jantes condiciones no privan a los ciudadanos de sus pro-
fesiones, sino que las regulan por razones del eminente
interés público de que están revestidas. *Román v. Trib.
Exam. de Médicos*, supra, pág. 77. *Morales v. Junta Exam.
de Ing.*, 99 D.P.R. 84 (1970); *Infante v. Trib. Examinador de
Médicos*, 84 D.P.R. 308, 314 (1961); *Castillo v. Tribl. Exa-
minador*, 81 D.P.R. 746, 750 (1960).

La política pública del Estado Libre Asociado res-

pecto a la salud de sus habitantes está contenida en el Art. 2 de la Ley de Reforma Integral de los Servicios de Salud de Puerto Rico, 24 L.P.R.A. sec. 3002, la cual declara que "la salud de nuestro pueblo merece y debe tener la más alta prioridad en las gestiones de su Gobierno", el cual "debe velar porque se preste [sic] y ofrecer a los habitantes de esta Isla *servicios de salud de la más alta calidad* y sin barreras de clase alguna que impidan el acceso a dichos servicios ...". 24 L.P.R.A. sec. 3002. Con el propósito de hacer viable este objetivo básico, el estatuto creó y reestructuró los organismos necesarios a fin de supervisar y reglamentar la administración y prestación de los servicios de salud en Puerto Rico. Para cada profesión de la salud la respectiva junta examinadora quedó a cargo de realizar vistas públicas para la reglamentación relativa a las licencias, renovación de licencias, educación continuada y certificación de las especialidades concernidas, además de aquella facultad que en virtud de su estatuto constitutivo posean. 24 L.P.R.A. sec. 3010.

El Tribunal Examinador de Médicos, creado en virtud de la Ley Núm. 22 de 22 de abril de 1931, según enmendada, 20 L.P.R.A. secs. 31–52d, es el órgano investido por ley con la facultad de autorizar el ejercicio de la profesión de médico-cirujano y osteólogo, *y certificar las especialidades en el área de la medicina,* 20 L.P.R.A. secs. 34 y 52c. Sus facultades son amplias, delegándosele de este modo la autoridad de implantar la política pública del Estado en cuanto a velar por que se presten servicios de la más alta calidad *por parte de la profesión médica,* al facultársele para asegurarse de que a tono con los modernos adelantos científicos, los miembros de la profesión médica posean el conocimiento, la preparación, las destrezas y la competencia adecuadas para ejercer dentro de los parámetros de mayor excelencia posibles. Al establecer las normas en cuanto al ejercicio de la profesión de médico-cirujano,

osteólogo y de las distintas especialidades, basta con que el T.E.M. justifique la *racionalidad* de los requisitos adoptados en conformidad con la política pública del Estado. *Román v. Trib. Exam. de Médicos*, supra; *Pérez v. Junta Dental*, supra; *Santiago v. Trib. Exam. de Medicos*, supra.

"Al reglamentar el acceso a una profesión el Estado no puede excluir aspirantes de forma, o por motivos que violenten el debido proceso de ley y la igual protección de las leyes. El Estado puede establecer unos requisitos de conocimientos mínimos, capacidad, destreza, entereza moral o cualquier otra calificación que esté racionalmente relacionada con el objetivo de garantizar que los admitidos posean la competencia para practicar la profesión en forma adecuada." *Santiago v. Trib. Exam. de Médicos*, supra, pág. 6. La prueba necesaria para sostener la razonabilidad de las restricciones es mínima. "El grado de interés público es tal que sólo se requiere 'alguna evidencia' de que las medidas son racionales, y por ende, válidas." *Román v. Trib. Exam. de Médicos*, supra, pág. 80.

Resolvemos que iguales principios aplican en cuanto a las determinaciones del T.E.M. respecto a cuáles áreas de la medicina constituyen parte de la práctica de una especialidad y cuáles son susceptibles de ser practicadas por médicos generalistas. La facultad del T.E.M. en cuanto a reglamentar la admisión al ejercicio de la profesión y certificar las especialidades, necesariamente implica la facultad para delimitar los campos entre lo que constituye la práctica general de la medicina y aquella que conforma los lindes de una especialidad o subespecialidad. Éstos, lejos de ser estáticos, están sujetos a la continua revisión del T.E.M. conforme a los diversos avances de la ciencia en cada área. El hacer viable esa continua renovación es parte de los objetivos que persigue el Estado mediante el mecanismo de juntas y tribunales examinadores. Véase 24 L.P.R.A. sec. 3009.

En cuanto a la controversia de autos, como hemos señalado, luego de analizar la prueba desfilada el T.E.M. concluyó, como cuestión de hecho, que "los médicos generalistas no adquieren en sus cuatro años de estudios de medicina los conocimientos necesarios para realizar refracciones y expedir recetas de espejuelos o lentes. Tampoco, durante ese período de estudios, adquieren destrezas para manejar —con la competencia requerida— los diversos instrumentos oftálmicos". Apéndice VIII, pág. 8. Adjudicó que "[a]diestramiento especializado de esta naturaleza sólo se ofrece a los médicos durante el período completo de su residencia en oftalmología .... La refracción es un campo especializado que está incluido en el campo de estudios de la oftalmología .... Así, pues, *entre los médicos, sólo los oftalmólogos están preparados para realizar la refracción en el paciente*".(8) (Énfasis suplido.) Íd.

*Tales conclusiones se encuentran fundamentadas por prueba amplia y sustancial desfilada ante el foro administrativo.* Siendo esto así, erró gravemente el tribunal de instancia al intervenir con las *determinaciones de hecho* realizadas por el organismo administrativo especializado. 3 L.P.R.A. sec. 2175. *Rodrigo v. Tribunal Superior*, 101 D.P.R. 151, 154 (1973); *Silva v. Adm. Sistemas de Retiro*, 128 D.P.R. 256 (1991); *Chase Manhattan v. Emmanuelli Bauzá*, 111 D.P.R. 708, 712 (1981); *Sucn. A. Bernat v. Peñagarícano, Admor.*, 84 D.P.R. 526, 531–533 (1962).

Los demandantes venían obligados a demostrar que la determinación del T.E.M. les privó arbitrariamente de su derecho a ejercer la optometría por motivos distintos y desvinculados al propósito de la normativa adoptada. *Román v. Trib. Exam. de Médicos*, supra, pág. 80. Existiendo amplio fundamento en la prueba que tuvo ante su conside-

---

(8) El T.E.M. tiene facultades en ley para reconocer especialidades en conformidad con la reglamentación existente o que éste adopte.

ración el T.E.M., deben sostenerse sus determinaciones de hechos en cuanto a que los médicos-cirujanos no poseen los conocimientos y las destrezas adecuados para dedicarse a la práctica de la refracción. No habiendo acreditado los demandantes a satisfacción del T.E.M. su capacidad, preparación y competencia, no pueden reclamar la autoridad en ley para ejercer en el campo especializado de la refracción. La responsabilidad del T.E.M. y demás juntas examinadoras no se limita a garantizar que los profesionales de la salud cumplan con un mínimo de preparación y destrezas, sino en velar por que se presten a los habitantes de Puerto Rico los servicios de salud de la más alta calidad. Véase 24 L.P.R.A. sec. 3002.

▬▬▬▬ Nuestra decisión de hoy no se circunscribe a un mero ejercicio de interpretación estatutaria y aplicación de la normativa vigente en abstracción de las consideraciones de política pública que implica la controversia en autos. Un principio básico informa ésta: cuando la Asamblea Legislativa regula la práctica de una profesión prima el interés, no de proteger a los miembros que la ejercen, sino de procurar el bienestar de la ciudadanía en general. Cuando se trata, como en este caso, de profesionales ligados al campo de la salud, el derecho del pueblo a tener el mayor acceso posible a los servicios de salud, a que se le garantice la más alta calidad de éstos y a que se le proteja contra la impericia, constituyen algunos de los propósitos fundamentales que orientan la acción reguladora del legislador. Por ello, quienes *reclamen autoridad en ley* para ejercer una profesión en el área de la salud deberán probar sus alegaciones mediante la acreditación de que poseen las *cualificaciones* adecuadas que el legislador exige en protección del interés público de salvaguardar la salud del pueblo. Véase Art. 2 de la Ley Núm. 11 de 23 de junio de 1976 (24 L.P.R.A. sec. 3002).

Por todo lo anterior, *revocamos el dictamen del tribunal de instancia y sostenemos la resolución del T.E.M.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Fuster Berlingeri emitió un voto separado de conformidad. El Juez Asociado Señor Negrón García no intervino.

— O —

Voto separado de conformidad del Juez Asociado Señor Fuster Berlingeri.

Estoy conforme con la opinión mayoritaria del Tribunal, ya que ésta responde a las normas estatutarias y a la política pública que inexorablemente regulan la controversia en cuestión. En asuntos como los de este caso, no tenemos facultad bajo la Constitución para sustituir nuestros criterios por los de las ramas políticas de gobierno.

Lo anterior no obstante, debo hacer la observación siguiente. Puerto Rico continúa sufriendo problemas serios en lo que respecta a los servicios de salud que están disponibles para la comunidad en general. Importantes sectores sociales sólo tienen acceso a servicios muy limitados; otros sectores tienen que pagar por tales servicios precios tan altos que realmente significa obtenerlos sólo a costa de grandes sacrificios. Con arreglo a esta situación, el Estado debería tener sumo cuidado de que sus legítimos esfuerzos por proteger a la ciudadanía contra la impericia profesional no tengan innecesariamente el resultado de limitar aun más el adecuado acceso de la gente a los servicios de salud. En particular, debería tener cuidado de no calcar de sociedades más afluentes los esquemas regulativos de éstas que a veces dan lugar a una monopolización social-

mente dispendiosa de servicios profesionales de primera necesidad.

En el caso ante nos resulta anómalo que personas adiestradas para ser médicos-cirujanos y que reclaman poseer los conocimientos y la habilidad necesarios para dedicarse a la práctica de la refracción se les impida hacerlo a base de juicios profesionales apriorísticos, por ilustrados que sean. Cuando el Estado y sus juntas examinadoras deciden quiénes pueden ejercer determinadas profesiones u oficios y quiénes no, sus decisiones deberían estar cuidadosamente avaladas por prueba *empírica* incuestionable, como la que surge, por ejemplo, de buenos exámenes de revalidación. De otro modo, se pueden crear ominosos riesgos como el de que el interés público quede supeditado a los intereses gremiales; el de que una sociedad de modesta afluencia se vea privada de un recurso significativo como es la labor de profesionales, cuya disponibilidad puede aumentar el volumen de los servicios y abaratar su costo; y el de que personas que dedicaron grandes esfuerzos y sacrificios para hacerse de una eminente profesión sufran trabas innecesarias para ejercerla en todas sus posibilidades.

Le corresponde al Tribunal Examinador de Médicos y, en su defecto, a las ramas políticas del Gobierno, encarar estas responsabilidades.