EL PUEBLO DE PUERTO RICO, apelado, *v.* LUIS R. VILLAFAÑE FABIÁN y ALBERTO CONTRERAS MARTÍNEZ, acusados y apelantes.

*Número:* CR-93-108        *Resuelto:* 10 de octubre de 1995

136

*Celso Suárez Alicea*, abogado de la parte apelante; *Pedro A. Delgado Hernández, Procurador General, Carlos Lugo Fiol, Subprocurador General, y Héctor Clemente Delgado, Procurador General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Comparecen ante nos Luis Villafañe Fabián y Alberto Contreras Martínez, y solicitan la revocación de la sentencia de culpabilidad emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, por el delito de práctica ilegal de la medicina, Art. 9 de la Ley Núm. 22 de 22 de abril de 1931 (20 L.P.R.A. sec. 39) en vista de que practicaron la naturopatía sin poseer una licencia expedida por el Tribunal Examinador de Médicos (en adelante Tribunal Examinador). Por entender que se probó la culpabilidad de los acusados mas allá de toda duda razonable, confirmamos.

I

El 6 de abril de 1992, el Ministerio Fiscal presentó acusaciones contra Luis R. Villafañe Fabián y Alberto Contreras Martínez. Les imputó la comisión del delito de práctica ilegal de la medicina. Celebrados los incidentes procesales de rigor, se llevó a cabo el juicio ante tribunal de derecho el 17 de agosto de 1992. La prueba presentada consistió en los testimonios de los agentes Santiago Ginés Romero y Nivea Collazo Calderón, del Cuerpo de Investigaciones Criminales (CIC), y el testimonio pericial del Dr. Boyd Hernández Collazo. Además, se presentaron como prueba documental varios formularios que llenaron los agentes

encubiertos en las oficinas de los acusados y cierta literatura relacionada con la medicina holística.

Según surge de la exposición narrativa de la prueba, la agente Collazo Calderón concertó una cita con Villafañe Fabián para el 22 de mayo de 1991 a las 10:30 A.M., en las oficinas de éste. Al comparecer al lugar indicado el día de la cita, Collazo Calderón observó un letrero que se presentaba así: "Dr. Luis R. Villafañe Fabián, N.D." y otro que tenía inscrito "Centro Biomagnético de Medicina Holística".

Al entrar al consultorio, una secretaria de nombre Janet la atendió y le entregó un documento sobre condiciones de salud y datos personales. Completado éste, Collazo Calderón pasó a la oficina privada de Villafañe Fabián y le informó que padecía de insomnio y estreñimiento. Éste no la tocó ni examinó. Su intervención se limitó a entrevistarla. Además, nunca le dijo que era médico.

La agente indicó que Villafañe Fabián le explicó el uso curativo de los imanes para el tratamiento de sus padecimientos, la acostó en una camilla y le colocó varios imanes sobre el vientre y el estómago. Señaló que permaneció allí con los ojos tapados por espacio de treinta (30) minutos.

Posteriormente, Villafañe Fabián le indicó que se levantara y le explicó el tratamiento con campo magnético, le recomendó que siguiera una dieta naturista, que consumiera vitaminas naturales y que utilizara enemas y se administrara lavados intestinales. Además, le entregó cierta literatura explicativa en torno a la dieta y a las vitaminas naturales recomendadas.

Por su parte, el agente Ginés Romero relató hechos similares con respecto a Contreras Martínez. Indicó que concertó una cita con éste, a llevarse a cabo en las mismas facilidades en las cuales laboraba Villafañe Fabián. Ese día lo atendió una secretaria de nombre Janet, quien le pidió que llenara un formulario. Finalizado éste, pasó a la oficina privada de Contreras Martínez y, a preguntas de

este último, le indicó que sufría de problemas estomacales. Contreras lo orientó sobre los hábitos alimentarios y, posteriormente, lo colocó en una camilla donde le aplicó el tratamiento con imanes, por un lapso de treinta (30) o cuarenta (40) minutos. Culminado el procedimiento, Contreras le entregó literatura sobre los hábitos alimentarios y el consumo de vitaminas. Recomendó, además, que se administrara dos (2) enemas de alfalfa y, si no mejoraba, un colónico.

De otra parte, el perito Dr. Boyd Hernández Collazo testificó que los elementos básicos de un historial médico son los datos sobre hospitalizaciones del paciente, enfermedades que se han padecido, operaciones sufridas y enfermedades de familiares cercanos. Señaló que un diagnóstico es la conclusión a la cual llegan los médicos luego de realizar un examen físico y, a veces, otras pruebas. Además, fundamentándose en la supuesta condición que sufrían los agentes encubiertos, indicó que la práctica de la medicina exigía que se evaluara el historial médico de los pacientes, se examinaran sus signos vitales, se auscultara el tórax, el corazón y los pulmones, se palpara el vientre y se realizaran varias muestras de laboratorio.

A la luz de dicha prueba, el Tribunal Superior encontró a los acusados culpables de practicar ilegalmente la medicina y los sentenció a dos (2) años de reclusión, a cumplirse según el régimen de sentencias suspendidas.

Inconformes con dicha determinación, recurren ante nos Villafañe Fabián y Contreras Martínez. Señalan que erró el Tribunal de Primera Instancia al determinar que para practicar la naturopatía en Puerto Rico es indispensable poseer una licencia otorgada por el Tribunal Examinador; al declararlos culpables a base de acusaciones insuficientes; al concluir que la conducta desplegada por ellos se ubica bajo los elementos del delito de práctica ilegal de la medicina, y al limitar irrazonablemente su derecho constitucional a dedicarse a una profesión legítima.

## II

La cuestión medular que se ha de resolver en este caso consiste en determinar si para practicar la naturopatía en Puerto Rico es necesario obtener previamente una licencia del Tribunal Examinador. En vista de la inexistencia de legislación específica en nuestro ordenamiento con respecto a la naturopatía, es necesario analizar la legislación general referente al campo de la salud y las disposiciones específicas relativas al Tribunal Examinador. Veamos.

A. En 1976, el Gobierno del Estado Libre Asociado de Puerto Rico aprobó la Ley de Reforma Integral de los Servicios de Salud (en adelante la Ley de Reforma Integral), Ley Núm. 11 de 23 de junio de 1976 (24 L.P.R.A. sec. 3001 *et seq.*). Ésta tuvo, entre otros, el propósito de declarar la política pública del Estado Libre Asociado en el área de la salud y proveer para la reestructuración de los organismos públicos relacionados con la salud y para la reglamentación y evaluación de todo el ámbito de la salud en Puerto Rico. Descripción Introductoria de la Ley Núm. 11 de 23 de junio de 1976.

En su Art. 2 dicha ley declara, en lo pertinente, que "la salud de nuestro pueblo merece y debe tener la más alta prioridad en las gestiones de su Gobierno" y que el Gobierno "debe velar por que se preste[n] y ofre[zcan] a los habitantes de esta Isla servicios de salud de la más alta calidad y sin barreras de clase alguna que impidan el acceso a dichos servicios". 24 L.P.R.A. sec. 3002.

Para implantar dicha política pública, la Ley de Reforma Integral se hizo extensiva a todas las "profesiones de la salud", las cuales la ley define como

> ... aquellas profesiones que están directamente relacionadas con la prestación de servicios profesionales de salud tales como la profesión médica, odontología, farmacéutica, administración de servicios de salud, nutrición y dietética, enfermería, fisioterapia, tecnología médica, terapia ocupacional, psicólogo, trabajo

médico social, podiatría, terapia del habla, optometría, educación en salud, quiropráctica, higiene y asistencia dental y otras similares. 24 L.P.R.A. sec. 3003(p) (Sup. 1995).

Además, con respecto a la reglamentación existente al momento de la aprobación de la ley específicamente relacionada con las distintas profesiones de la salud, el estatuto de Reforma Integral transfiere al Departamento de Salud todos los poderes que sobre ellas tenía el Departamento de Estado. 24 L.P.R.A. sec. 3009.

■ Forma parte de dicha reglamentación lo relativo a las juntas examinadoras de las distintas profesiones de la salud. Dichas juntas tienen, entre otras, la función de otorgar licencias profesionales y asegurarse de que las personas a las cuales se les otorgan cumplan con los requisitos mínimos de destreza, aptitud y conocimiento necesarios para ejercer competentemente la profesión de salud de que se trate. 24 L.P.R.A. sec. 3010; *Asoc. Drs. Med. Cui. Salud V. v. Morales*, 132 D.P.R. 567 (1993).

■ Entre dichas juntas examinadoras se encuentra el Tribunal Examinador, que es el organismo encargado de autorizar el ejercicio de la medicina, acupuntura y osteología en Puerto Rico. 20 L.P.R.A. sec. 34. El estatuto que lo creó le otorgó amplios poderes para reglamentar dichas profesiones en esta jurisdicción. Entre estos se destaca la facultad para denegar, suspender, cancelar o revocar cualquier licencia y emitir órdenes para poner a prueba a cualquier médico por tiempo determinado. 20 L.P.R.A. sec. 34.

■ Aunque el estatuto creador del Tribunal Examinador no define per se qué constituye la práctica de la medicina, su Art. 9 especifica cuándo se considera que una persona ejerce ilegalmente dicha profesión. Éste dispone que.

... se considerará como ejerciendo ilegalmente la medicina y cirugía o la osteología, cualquier persona que sin poseer una licencia expedida por el Tribunal escribiere, redactare o publicare un aviso o anuncio pretendiendo estar capacitada legal-

mente para ejercer la medicina o la osteología; ofreciere servicios, algún aviso, anuncio o cualquier otra forma; y que pretendiere estar capacitada para examinar, diagnosticar, tratar, operar o recetar para cualquier enfermedad, dolor, lesión, deformidad o condición física y/o mental o que lleve a cabo o se ofrezca por cualesquiera medios o métodos para examinar, diagnosticar, tratar, operar, o recetar para cualquier enfermedad, dolor, lesión, deformidad, o condición física y/o mental, reciba o no remuneración por tales servicios. 20 L.P.R.A. sec. 39.

Resulta pertinente aclarar la redacción de la segunda modalidad descrita en el tipo penal. Ésta fue producto, a nuestro entender, de una omisión inadvertida del legislador al enmendar el delito de práctica ilegal de la medicina mediante la Ley Núm. 1 de 25 de junio de 1986 (20 L.P.R.A. sec. 31 *et seq.*). Dicha modalidad debe expresar: "ofreciere servicios de medicina u osteología por medio de algún aviso, anuncio o en cualquier otra forma", según constaba antes de la mencionada enmienda y, a tenor con el deseo del legislador de intercambiar el término "osteopatía" por el de "osteología". Ley Núm. 1, *supra*. Sólo así, ésta resulta coherente.

Ahora bien, se desprende de la disposición antes transcrita que existen cuatro (4) modalidades del delito de práctica ilegal de la medicina. Así, se incurre en la práctica ilegal de la medicina cuando cualquier persona que, sin tener una licencia expedida por el Tribunal Examinador: (1) escriba, redacte o publique un aviso o anuncio pretendiendo estar capacitado para ejercer legalmente la medicina o la osteología; (2) ofrezca servicios de medicina mediante algún aviso, anuncio o en cualquier otra forma; (3) pretenda estar capacitado para examinar, diagnosticar, tratar, operar o recetar para aliviar cualquier enfermedad, dolor, lesión, deformidad o condición física y/o mental, o (4) lleve a cabo o se ofrezca por cualesquiera medios o métodos para examinar, diagnosticar, tratar, operar o recetar para aliviar cualquier enfermedad, dolor, lesión, deformidad o condición física y/o mental, reciba remuneración o no por tales servicios.

Tal conclusión se desprende claramente de una lectura integral del estatuto. Ésta revela un intento abarcador de penalizar toda conducta que pueda tener un efecto detrimental sobre los servicios de salubridad que se ofrecen a nuestros ciudadanos.

Al aplicar las normas anteriores al caso de autos, entendemos que la naturopatía está prohibida por el artículo transcrito cuando se practica sin haber obtenido previamente una licencia del Tribunal Examinador.

■ La naturopatía, también conocida como "medicina natural", constituye un área particular del amplio campo de la "medicina holística". H.M. Rian, *An Alternative Contractual Approach to Holistic Health Care*, 44 Ohio St. L. J. 185 (1983). Ésta ha sido definida como:

> ... a distinct system of primary health care — a science, philosophy, and practice of diagnosing, and preventing disease. Panfleto explicativo de y cursos del National College of Naturopathic Medicine.

En vista de dicha definición, se entiende que el doctor en naturopatía lleva a cabo las funciones siguientes:

> Diagnoses, treats, and cares for patients, using a system or practice that bases its treatment of all physiological functions and abnormal conditions on natural laws governing the body: Utilizes physiological, psychological, and mechanical methods, such as air, water, light, heat, earth, phytotherapy, food and herb therapy, psychotherapy, electrotherapy, physiotherapy, minor and orificial surgery, mechanotherapy, naturopathic corrections and manipulation, and all natural methods or modalities, together with natural medicines, natural processed foods, and herbs and nature's remedies. Excludes major surgery, therapeutic use of X-ray and radium, and use of drugs, except those assimilable substances containing elements or compounds which are components of bodily tissues and are physiologically compatible to body processes for maintenance of life. *Dictionary of Occupational Titles*, 3ra ed., Washington, D.C., Ed. U.S. Dept. of Labor, 1965, Vol. I, págs. 214–215.

Así, la naturopatía se propone tratar el cuerpo humano, a través de métodos naturales, con el fin de evitar las en-

fermedades futuras y sanar las existentes. Por lo tanto, el doctor en naturopatía tiene que diagnosticar, tratar y cuidar médicamente a sus pacientes.

▪ Al comparar las funciones del naturópata con las funciones del médico tradicional, surge con meridiana claridad la similitud entre ambas. La única diferencia entre las respectivas funciones se circunscribe a los métodos utilizados para lograr vencer las enfermedades que aquejan el cuerpo humano, y ésta no es pertinente a la controversia de autos.

Por lo tanto, en vista de la concepción de la medicina del estatuto, el ejercicio de la naturopatía constituye una práctica de la medicina en Puerto Rico.

B. En apoyo de su apelación, los apelantes arguyen que, de un análisis gramatical del estatuto, se desprende que para incurrir en el delito de práctica ilegal de la medicina es necesario que se cumplan simultáneamente las circunstancias descritas en el tipo penal. Es decir, que se trata de elementos del delito, no sus modalidades.

Igualmente aducen que en ningún lugar de la ley creadora del Tribunal Examinador se definen los términos "medicina", "diagnosticar" y "recetar" y, por lo tanto, se deben entender dichos términos en su definición médico-técnica. A base de dicha interpretación, los apelantes entienden que como los naturópatas no llevan a cabo el mismo procedimiento que los médicos para llegar a una conclusión con respecto a sus pacientes y a que no "recetan" fármacos, no se deben ubicar bajo los presupuestos del tipo penal. No tienen razón.

▪ En primer término, aun cuando la conjunción "y" se considera copulativa, mientras que la conjunción "o" se considera disyuntiva, ambas "son de significado intercambiable y que si la legislación usa una de ellas y la intención evidente es la de que se debió usar la otra, se sustituye una por la otra". R.E. Bernier y J.A. Cuevas Segarra, *Aproba-*

*ción e interpretación de las leyes de Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 353. Véanse, además: *Pueblo v. Mantilla*, 71 D.P.R. 36, 42–43 (1950); *Monllor & Boscio, Sucrs. v. Sancho Bonet, Tes.*, 49 D.P.R. 576, 579 (1936); *Pueblo v. Febres Colón*, 95 D.P.R. 172, 175 (1967); *Pueblo v. Colón Rosa*, 96 D.P.R. 601, 607 (1968).

Así, entendemos que en este caso la intención evidente es que se debió usar la conjunción "o" entre la modalidad relativa a ofrecer los servicios de medicina y la de pretender estar capacitado para examinar, diagnosticar, tratar, etc. A esos efectos, resulta pertinente que el propio Art. 9, *supra*, configura, como delito grave, varias modalidades adicionales. Entre ellas se encuentra la de anunciarse como especialista o como osteólogo sin poseer la licencia correspondiente. 20 L.P.R.A. sec. 39. En consecuencia, resultaría incompatible que el legislador hubiese dispuesto, como arguyen los apelantes, que todo aquel que tan sólo se anuncie como especialista incurra en el delito de la práctica ilegal de la medicina; mientras que el que se anuncie como médico generalista no incurriría en responsabilidad, a menos que también pretenda estar capacitado para examinar, diagnosticar o recetar para cualquier enfermedad, dolor o lesión. Por lo tanto, nos es forzoso concluir que se trata de modalidades del delito. De lo contrario, llegaríamos a un resultado absurdo. *El Pueblo v. Ramos*, 18 D.P.R. 993, 1004 (1912). Véase, además, Bernier y Cuevas Segarra, *op. cit.*, pág. 357.

Más aún, ya para 1917, refiriéndonos a la disposición antecesora de la que hoy examinamos, y luego de analizarla frente a la versión original en el idioma inglés, dispusimos que las circunstancias expuestas en el tipo penal eran modalidades del delito. *El Pueblo v. Ruiz*, 25 D.P.R. 590, 592 (1917). Es decir, aun cuando se utilizaba la conjunción "y" en el estatuto pertinente, dispusimos con claridad que las circunstancias expresadas en el estatuto correspondían a modalidades del delito, no a sus elementos.

En resumen, se configura el delito de práctica ilegal de la medicina siempre que se lleven a cabo cualesquiera de las actividades que el tipo penal expresa, sin haber obtenido previamente una licencia del Tribunal Examinador para el ejercicio de la medicina. Las circunstancias descritas en el tipo penal no constituyen elementos constitutivos del delito, sino las modalidades de éste.

Con respecto al argumento relativo a las definiciones médico-técnicas, los apelantes olvidan que nuestro Código Penal, cuyas disposiciones generales aplican a las leyes penales especiales en virtud de su Art. 5 (33 L.P.R.A. sec. 3005), dispone que "[l]as palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente". Art. 6 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 3021. En consecuencia, la interpretación del estatuto dependerá del significado sancionado por el uso común de dichos términos que conforman el tipo penal. A esos efectos, revisemos las definiciones comunes de éstos.

El vocablo "medicina" se define como "[c]iencia y arte de precaver y curar las enfermedades del cuerpo humano". *Diccionario de la Lengua Española*, 19na ed., Madrid, Ed. Espasa-Calpe, 1970, pág. 860. Igualmente, el vocablo "diagnosticar" significa "[d]eterminar el carácter de una enfermedad mediante el examen de sus signos", íd., pág. 472, y el vocablo "recetar" significa prescribir un medicamento, con expresión de su dosis, preparación y uso". Íd., pág. 1112.[1]

De una simple lectura de dichas definiciones, y al compararlas con las funciones del naturópata, no cabe la menor duda de que la práctica de la naturopatía está in-

---

[1] En cuanto a la palabra "medicamento", ésta se define como "[c]ualquiera substancia, simple o compuesta, que, aplicada interior o exteriormente al cuerpo del hombre o del animal, puede producir un efecto curativo". *Diccionario de la Lengua Española*, 19na ed., Madrid, Ed. Espasa-Calpe, 1970, pág. 860.

cluida, según nuestra legislación, dentro del concepto de la práctica de la medicina. A nuestro entender, no puede ser de otro modo, pues según el propósito protector de la legislación de salubridad, todo profesional, cuyas funciones sean el tratamiento del cuerpo humano para erradicar las enfermedades y mantener la buena salud, llámese naturista, ortopeda o generalista, estará cubierto por los estatutos que reglamentan la práctica de la medicina. Nos hacemos eco del Tribunal Supremo de Florida cuando indicó:

> ...insofar as he prescribed a proper diet to cure or alleviate the specific medical problems he diagnosed, Reams "treated" the illnesses of his patients. We reject the argument that because the substances "prescribed" were vitamins or food rather than "medicines" as the word is generally used, Reams did not treat diseases in the medical sense. *Reams v. State*, 279 So. 2d 839, 842 (1973).

C. La conclusión a la que hoy llegamos reafirma la corriente mayoritaria existente. en Estados Unidos con respecto a la reglamentación de la naturopatía como práctica de la medicina. Ello es en ausencia de disposición por parte de nuestra Asamblea Legislativa para crear una reglamentación particular al respecto.(²) Al presente, tan sólo un puñado de estados de la unión americana han reglamentado la naturopatía como una profesión de la salud separada y distinta de la medicina tradicional. Véanse: 2 Alaska Stat. Sec. 08.45.020 *et seq.* (1995); 10A Ariz. Rev. Stat. Ann. Sec. 32-1521 (1986); 11A Conn. Stat. Ann. Sec. 20-37 *et seq.* (1989); 2 D.C. Stat. Ann. 2-3309.1; 25 Hawaii Stat. Ann. Sec. 455-1 (1985); 37 Mont. Stat. Ann. Sec. 26-401; 52 Or. Rev. Stat. Sec. 685.010 *et seq.*; 18 Wash Stat.

---

(²) Actualmente se encuentra ante la consideración de la Asamblea Legislativa el P. del S. 1032 de 16 de febrero de 1995, 12ma Asamblea Legislativa, 5ta Sesión Ordinaria, cuyo propósito es reglamentar la práctica de la naturopatía y crear los organismos encargados de administrar dicha reglamentación. Este esfuerzo constituye la renovación de varios intentos fallidos de implantar la naturopatía como una profesión de la salud independiente de la medicina tradicional. Véanse: P. del S. 1369 (1992); P. de la C. 1648 (1992); P. del S. 898 de 10 de marzo de 1983, 9na Asamblea Legislativa, 3ra Sesión Ordinaria.

Ann. 36A.030. La mayoría de los estados requieren a los naturópatas, previo a la práctica de su profesión, obtener una licencia para practicar la medicina. Véanse, entre otros: *Williams v. State Ex Rel. Med. Licensure*, 453 So. 2d 1051 (1984); *State v. Howard*, 337 S.E.2d 598 (1985); *People v. Ray*, 456 N.E.2d 179 (1983); *Reams v. State*, supra, pág. 842.

Afortunadamente, nuestros pronunciamientos con respecto a la naturopatía se materializan en el contexto del caso de autos, en el que la práctica irrestricta de la naturopatía no ha causado grandes problemas y no bajo circunstancias más severas, en que esté en juego la pérdida de la vida humana. *State v. Howard*, supra. La salud y la vida humana son valores jurídicos de la más alta jerarquía. Su protección requiere el ejercicio máximo de las prerrogativas gubernamentales. Sólo así hacemos viable la consecución de los objetivos de la Ley de Reforma Integral.

### III

En la faceta procesal del caso, los apelantes alegan que se les procesó a base de acusaciones insuficientes. No tienen razón.

La Regla 35 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, dispone los datos que deberá tener toda acusación válida. En particular, su inciso (c) exige, en lo pertinente, que toda acusación contenga "[u]na exposición de los hechos esenciales constitutivos del delito, redactada en lenguaje sencillo, claro y conciso, y de tal modo que pueda entenderla cualquier persona de inteligencia común". 34 L.P.R.A. Ap. II. Así, la acusación debe incluir todos los elementos del delito imputado, expresados en un lenguaje que esté al alcance de la comprensión del ciudadano promedio. Esta exigencia está íntimamente relacionada tanto con el principio de legalidad que rige nuestro ordenamiento penal, Art. 8 del Código Penal de Puerto

Rico, 33 L.P.R.A. sec. 3031, como con los requerimientos que impone el debido procedimiento de ley.

Sin embargo, al analizar la suficiencia de las acusaciones éstas deben interpretarse con liberalidad, pues ellas "deben informar a los acusados de qué se les acusa, pero no es para ello necesario seguir ningún lenguaje estereotipado o técnico o talismánico". *Pueblo v. Calviño Cereijo*, 110 D.P.R. 691, 694 (1981). No es necesario que se incluya la modalidad específica del delito por el cual se acusa, *Pueblo v. Santiago Cedeño*, 106 D.P.R. 663 (1978), excepto cuando se trate de modalidades de agravación. *Pueblo v. González Olivencia*, 116 D.P.R. 614 (1985). "Puede afirmarse, en fin, que la suficiencia de una acusación se evalúa en forma liberal en cuanto al lenguaje utilizado en la imputación del delito, aunque en forma rigurosa en cuanto a la necesidad de imputar todos los elementos del mismo". E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1993, Vol. III, pág. 149.

Analizadas las acusaciones, a la luz de los elementos del delito de práctica ilegal de la medicina y de los anteriores señalamientos, entendemos que éstas son suficientes para imputar con válidez el delito de práctica ilegal de la medicina.

Como indicamos antes, se configura el delito de práctica ilegal de la medicina cuando, sin tener licencia expedida por el Tribunal Examinador, cualquier persona: (1) escribe, redacta o publica un aviso o anuncio pretendiendo estar capacitado para ejercer legalmente la medicina o la osteología; (2) ofrece servicios de medicina u osteología mediante algún aviso, anuncio o cualquier otra forma; (3) pretende estar capacitado para examinar, diagnosticar, tratar, operar o recetar para cualquier enfermedad, dolor, lesión, deformidad o condición física y/o mental, o (4) lleva a cabo o se ofrece por cualesquiera medios o métodos para examinar, diagnosticar, tratar, operar o rece-

tar para cualquier enfermedad, dolor, lesión, deformidad o condición física y/o mental, reciba remuneración o no por tales servicios.

Por otro lado, ambas acusaciones indican, en lo pertinente, que los acusados,

"... ilegal, voluntaria, malicios[a], criminalmente y sin tener licencia expedida por el Tribunal Examinador de Médicos ... para ejercer la profesión de la medicina en P[uerto Rico], ofre[cieron] servicios como Médico y pretend[ieron] estar capacitado[s] para examinar, diagnosticar, tratar o recetar para cualquier enfermedad, dolor, deformidad, condición física o mental; examinando, diagnosticando y recetando como médico ...." Alegato de los apelantes, pág. 6.

Así, se desprende de una sencilla lectura de las acusaciones que ambas indicaban con claridad que los apelantes, sin tener licencia expedida por el Tribunal Examinador, "ofreci[eron] servicios como [m]édico y pretendi[eron] estar capacitados para examinar, diagnosticar, tratar o recetar para cualquier enfermedad, dolor, deformidad, condición física o mental; examinando, diagnosticando y recetando como médico....". Íd. Es decir, ambas acusaciones incluyeron todos los elementos del delito de práctica ilegal de la medicina y, por lo tanto, informaron debidamente a los apelantes del delito por el cual se les acusó. Chiesa Aponte, *op. cit.*

No incurrió en error el tribunal sentenciador, por cuanto las acusaciones, a base de las cuales se procesó criminalmente a los acusados, eran suficientes para imputar el delito de práctica ilegal de la medicina.

IV

De otra parte, los apelantes señalan que erró el foro de instancia, ya que la sentencia dictada les viola su derecho constitucional a dedicarse a una profesión legítima. No estamos de acuerdo.

■ Como manifestación de su poder regulador (*police power*), el Estado tiene una extensa discreción para regular y controlar la práctica de las profesiones con el fin de proteger la salud y el bienestar públicos. *Román v. Tribl. Exam. de Médicos*, 116 D.P.R. 71, 79 (1985). En el ejercicio de ella, éste "puede prohibir la práctica de una profesión, a menos que primero se obtenga una licencia, permiso o certificado de alguna entidad u oficial examinador". *Col. Ing. Agrim. P.R. v. A.A.A.*, 131 D.P.R. 735 (1992).

■ Aun cuando los ciudadanos tienen un derecho constitucional a dedicarse a la profesión u ocupación de su predilección, dicho derecho no es absoluto. Art. II, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1. Ese derecho está subordinado a las condiciones que razonablemente imponga la Asamblea Legislativa en el ejercicio del poder reglamentador que posee en beneficio de los ciudadanos. *Pérez v. Junta Dental*, 116 D.P.R. 218, 233 (1985); Op. Sec. Just. Núm. 1973-13. "Semejantes condiciones no privan a los ciudadanos de sus profesiones, sino que las regulan por razones del eminente interés público de que están revestidas." *Asoc. Drs. Med. Cui. Salud V. v. Morales*, supra, pág. 586, y casos allí citados.

■ En vista del alto interés público que subyace a este tipo de reglamentación, el estándar aplicable, cuando ésta es objeto de ataque constitucional, es de racionalidad. Es decir, la reglamentación se sostendrá siempre que se justifique la racionalidad de los requisitos adoptados en conformidad con la política pública del estado. *Asoc. Drs. Med. Salud V. v. Morales*, supra; *Román v. Tribl. Exam. de Médicos*, supra, pág. 79; *Pérez v. Junta Dental*, supra.

■ Examinado el delito de práctica ilegal de la medicina, según aplicado a la práctica de la naturopatía, a la luz de las expresiones anteriores, surge con claridad una relación racional entre dicho estatuto y la política pública del Estado cuando de cuestiones de salubridad se trata.

Como indicamos anteriormente, la política pública del Estado Libre Asociado en materia de salud exige un esfuerzo gubernamental para lograr que se presten y ofrezcan a nuestro Pueblo servicios de salud de la más alta calidad. Dicha calidad tan sólo se logra al imponer a las profesiones pertinentes unos requisitos de estudios avanzados y específicos que garanticen un alto grado de competencia profesional y de conocimientos.

En Estados Unidos se ha llegado al mismo resultado nuestro, ante ataques constitucionales a la negativa de los estados de reconocer la naturopatía como una profesión distinta y separada de la medicina tradicional. Se ha entendido que las Asambleas Legislativas no tienen obligación alguna de reconocer a la naturopatía como profesión de salud separada y que tal proceder no violenta derecho constitucional alguno de las personas que desearían dedicarse a su práctica. Véanse: *Davis v. Beeler*, 207 S.W.2d 343 (1947), apelación desestimada por falta de una cuestión constitucional sustancial, 333 U.S. 859 (1948); *Taylor v. State*, 291 P.2d 1033 (Okl. 1955), apelación desestimada por no plantear una cuestión constitucional sustancial, 352 U.S. 805 (1956); *Hitchcock v. Collenberg*, 140 F. Supp. 894 (D. Md. 1956), confirmado, 353 U.S. 919 (1957); *Stuart v. Wilson*, 211 F. Supp. 700 (N.D. Tex. 1962), confirmado, 371 U.S. 576 (1962).

Así, en *Idaho Ass'n, Etc. v. U.S. Food and Drug Admin.*, 582 F.2d 849 (4to Cir. 1978), *cert.* denegado, 440 U.S. 976 (1979), luego de hacer un recuento de las decisiones estatales que sostuvieron la potestad de las respectivas Asambleas Legislativas de exigir a los naturópatas el mismo entrenamiento que a los médicos cirujanos y mantener la naturopatía dentro del campo de la medicina tradicional, el Cuarto Circuito de la Corte de Apelaciones de Estados Unidos indicó:

We conclude that the naturopaths' various constitutional claims depend on a single underlying contention: that a state

must recognize naturopathy as a discipline distinct from the orthodox practice of medicine whose practitioners are entitled to licensing requirements different from those imposed on other physicians. If the naturopaths are correct in this assertion, their other contentions may well have merit, but if it fails, all of their claims must fall with it. In light of the decisions of the Supreme Court that we have reviewed, we find that the naturopaths' basic claim has been firmly, repeatedly, and authoritatively rejected. *Idaho Ass'n, Etc. v. U.S. Food and Drug Admin.*, supra, págs. 853–854.

En resumen, la reglamentación, aquí en controversia, no padece de defecto constitucional alguno en su aplicación a la práctica de la naturopatía.

## V

Con respecto a la apreciación de la prueba, los imputados señalan que la conducta manifestada por ellos no constituye la conducta tipificada en su delito de práctica ilegal de la medicina. Tampoco tienen razón.

De los testimonios de los agentes encubiertos que testificaron en el juicio se desprende que ambos imputados mantienen oficinas con letrero que les identifica como "Centro Biomagnético de Medicina Holística" con el propósito de ofrecer sus servicios al público, recibir pacientes y tratar sus enfermedades. Ambos imputados recibieron en sus oficinas a los agentes encubiertos, les administraron un cuestionario sobre problemas de salud y hábitos alimentarios, les trataron las supuestas enfermedades mediante métodos biomagnéticos y les recetaron medicamentos naturales para remediar los males físicos reportados. Todo esto sin haber obtenido previamente una licencia del Tribunal Examinador.

En consecuencia, no tenemos duda de que en el juicio se probó, más allá de toda duda razonable, que los imputados practicaron ilegalmente la medicina. Ciertamente, la evidencia presentada produce convicción moral en una conciencia exenta de preocupación o en "un ánimo no

prevenido". Regla 10 de Evidencia, 32 L.P.R.A. Ap. IV. Véanse: *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454, 472 (1988); *Pueblo v. Ortiz Morales*, 86 D.P.R. 456 (1962).

*Por los fundamentos que anteceden, procede la confirmación de las sentencias emitidas en el caso de autos.*

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Rebollo López disintió sin opinión escrita. El Juez Asociado Señor Fuster Berlingeri emitió una opinión disidente, a la cual se unió la Juez Asociada Señora Naveira de Rodón.

— O —

Opinion disidente emitida por el Juez Asociado Señor Fuster Berlingeri, a la cual se une la Juez Asociada Señora Naveira de Rodón.

I

En Puerto Rico, como fundamento primordial de nuestro ordenamiento jurídico penal, rige el principio de legalidad, axioma básico contenido en la antigua máxima *nulla poena sine lege.* Conforme a éste, el Estado no puede instar una acción penal contra persona alguna por un hecho que no esté expresamente definido por la ley como delito, ni se puede imponer penas que la ley no haya establecido previamente. Art. 8 del Código Penal, 33 L.P.R.A. sec. 3031. Esto quiere decir que, en un caso en que se le imputa a alguien la comisión de un delito, tal delito y la pena que acarrea tienen que estar claramente previstos en el ordenamiento penal antes de que hayan ocurrido los hechos punibles. No se puede castigar a una persona por una conducta que no esté expresa y claramente contenida dentro

de las que el ordenamiento penal prohíbe. *Tampoco se puede crear delitos por analogía.*

Uno de los corolarios del principio de legalidad es que los estatutos penales deben interpretarse restrictivamente. Si existen dudas sobre el alcance o la aplicación de una disposición penal, tales dudas deben resolverse en favor del acusado. *Pueblo v. De León Martínez*, 132 D.P.R. 746 (1993); *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404, 409 (1988); *Pueblo v. Ríos Nogueras*, 114 D.P.R. 256, 260 (1983); *Pueblo v. Uriel Álvarez*, 112 D.P.R. 312, 313 (1982). Como consecuencia de estas normas fundamentales y del mandato constitucional sobre el debido proceso de ley, no se puede hacer responsable en lo criminal a una persona por un proceder que ella razonablemente no podía prever que estuviese prohibido. *Pueblo v. Tribl. Superior*, 81 D.P.R. 763, 787 (1960).

En el caso de autos, el texto de la ley bajo la cual se condenó a los apelantes no está suficientemente claro. Por el contrario, contiene lagunas y vaguedades que no permiten afirmar que la conducta de los acusados estaba razonablemente prevista en las prohibiciones de ley. Aplican aquí, pues, los fundamentales principios jurídicos antes reseñados, por lo que este Tribunal, en lugar de confirmar la condena de instancia, ha debido revocarla. Veamos.

De un análisis del lenguaje pertinente del estatuto en cuestión y de los propios señalamientos hechos por la mayoría en su opinión surge, en primer lugar, que al incorporarse al estatuto que regula la profesión médica las enmiendas introducidas por la Ley Núm. 1 de 25 de junio de 1986 (20 L.P.R.A. sec. 31 *et seq.*), la Legislatura dejó fuera del texto una frase importante, por lo que una parte de éste, referente al delito de la práctica ilegal de la medicina, *resulta incoherente.* La mayoría conjura por su cuenta esta obvia incoherencia al suplir ahora lo que, a su juicio, el legislador dejó fuera. Esto de por sí levanta dudas sobre si

puede aplicarse esta ley a los acusados en este caso, conforme con el principio de legalidad.

En segundo lugar, por otras deficiencias en el texto de la referida ley, conforme señala la propia mayoría en su opinión, existe una controversia en torno a si el estatuto aludido tipifica el delito en cuestión como uno que tiene varios elementos constitutivos o, en cambio, si dicho estatuto establece más bien diferentes modalidades del referido delito. La mayoría intenta conjurar esta segunda deficiencia al resolver, *por primera vez*, que el estatuto aludido crea distintas modalidades del delito en cuestión. Rechaza así la interpretación alterna alegada por los apelantes, de que el estatuto enumera diferentes elementos del delito.

Esta segunda intervención de la mayoría del Tribunal para remediar las fallas del estatuto, vista junto con la primera, pone de relieve las serias dificultades que existen conforme con el principio de legalidad, para aplicar dicho estatuto a los acusados. Resulta evidente que para llegar a su conclusión de que el estatuto tipifica varias modalidades del delito de práctica ilegal de la medicina, la mayoría se ha visto en la necesidad de aducir diversos fundamentos, lo que de por sí resalta aún más el carácter confuso, poco claro, de la disposición en cuestión con respecto a los acusados.

La posición de la mayoría se torna insostenible una vez se examinan los fundamentos referidos, ya que todos son realmente endebles. Según la mayoría, la Legislatura equivocadamente utilizó, en el texto de la ley en cuestión, la conjunción "y", que de ordinario se considera copulativa, cuando debió haber usado "o" (conjunción disyuntiva), porque de lo contrario dicho texto tendría un significado absurdo. Añade la mayoría que su interpretación encuentra apoyo en una antigua decisión nuestra, en *El Pueblo v. Ruiz*, 25 D.P.R. 590, 592 (1917), en la cual este Tribunal llegó a una determinación supuestamente similar en rela-

ción con un estatuto *antecesor* del que es ahora objeto de nuestro análisis. Finalmente, en lo que es claramente un razonamiento *por analogía,* la mayoría aduce que sería absurdo resolver que quien se anuncie como *médico generalista,* no incurre en el delito de práctica ilegal de la medicina, a menos que además pretenda estar capacitado para examinar, diagnosticar o recetar como tal, cuando el legislador dispuso que el que tan sólo se anuncie como *especialista* sin serlo, comete un delito sujeto a la misma pena.

Los referidos fundamentos no son inexpugnables. Por el contrario, en el caso de autos existen otros fundamentos que permiten razonablemente interpretar el estatuto en cuestión de una manera distinta de como lo hace la mayoría.

El texto de la ley que fue objeto de análisis en *El Pueblo v. Ruiz,* supra, es claramente distinto del que tenemos ahora ante nuestra consideración. Allí examinamos la aplicación de la ley de 1903, que disponía como delito *menos grave* el ejercicio ilegal de la "medicina o cirugía o cualesquiera otras ramas de éstas, o la obstetricia", sujeto a una multa no mayor de quinientos dólares ($500) o pena de reclusión por un término de treinta (30) a noventa (90) días. En aquel caso, el acusado había alegado, que como en el texto de la ley vigente entonces se usaba la conjunción "y", en lugar de la "o" usada en el texto original para que se entendiera cometido el delito de práctica ilícita de la medicina, no era suficiente únicamente que se prescribiera una receta, "sino que era necesario que esa prescripción la hiciera una persona que hubiera añadido a sus nombres las letras D.M. y que públicamente se anunciara como médico". Íd., págs. 590–591. Al rechazar tal alegación, allí resolvimos que, no obstante la redacción del estatuto, la intención legislativa era tal que

> ... una persona que a sabiendas y con intención de usurpar las funciones de los médicos autorizados, prescribiere para uso de cualquiera otra persona alguna medicina, etc., comete el delito

aunque no haya añadido a su nombre las letras M.D., ni se haya anunciado públicamente como médico o cirujano. Íd., pág. 592.

Como puede observarse, no resolvimos allí de manera expresa alguna, como alega la mayoría, que las diversas circunstancias mencionadas en el estatuto correspondían a distintas modalidades del delito. Más bien, resolvimos únicamente que el principal motivo de la enmienda introducida por la Ley Núm. 6 de 11 de marzo de 1915 (20 L.P.R.A. sec. 31 n.) era requerir, para que quedara perfeccionado el delito, que se probara que la prescripción se había hecho a sabiendas y con la intención de *usurpar las funciones de los médicos autorizados. El Pueblo v. Ruiz*, supra, pág. 593. Resolvimos, además, en aquel caso que podrían existir situaciones en las que el simple hecho de prescribir un medicamento no debiera ser considerado como delictivo, a menos que hubiese la intención de usurpar las funciones de un médico autorizado o que el hecho aislado "sea tan completo en sí, que cumpla con todas las exigencias de la ley". Íd., pág. 594. No es correcto, pues, utilizar a *El Pueblo v. Ruiz*, supra, como lo hace la mayoría, como fundamento para resolver que el tercer párrafo del Art. 9 de la Ley Núm. 22 de 22 de abril de 1931, según enmendada, 20 L.P.R.A. sec. 39, establece varias modalidades del delito de práctica ilegal de la medicina y que, entre ellas, anunciarse como médico generalista, por sí solo, constituye el delito referido. Aparte del error sustancial que significa resolver a base de *analogías*, cuando ello está expresamente prohibido por el Código Penal, por razón del principio de legalidad, la mayoría utiliza a *El Pueblo v. Ruiz*, supra, acomodaticiamente. Aduce que la decisión sostiene algo más de lo que realmente resolvimos allí. Cabe señalar, además, que apoyar su decisión en *El Pueblo v. Ruiz*, supra, es improcedente también, porque la naturaleza del delito que es objeto de nuestra consideración ahora, es cualitativamente distinta de la que analizamos en *El Pueblo v. Ruiz*,

supra, por ser el de autos un *delito grave* que conlleva pena de dos (2) a cinco (5) años de reclusión, cuando en *El Pueblo v. Ruiz*, supra, tratamos con un *misdemeanor.*

Por otro lado, si ya en *El Pueblo v. Ruiz*, supra, en referencia al uso de la conjunción "y", habíamos intimado la importancia de utilizar el lenguaje correcto en la redacción de la definición del delito de práctica ilegal de la medicina, habría que cuestionar la verdadera intención de la Legislatura al utilizar de nuevo dicha conjunción "y" en la próxima versión de la ley en cuestión y de mantener su uso en dicha ley, luego de numerosas enmiendas a ésta.[1]

Finalmente, debe señalarse que la interpretación de la mayoría de que el estatuto vigente no enumera diferentes elementos del delito de práctica ilegal de la medicina sino

---

[1] Originalmente, el Art. 9 de la Ley Núm. 22 de 22 de abril de 1931 (20 L.P.R.A. sec. 39) disponía, en lo pertinente, de la manera siguiente:

"Para los efectos de esta Ley se considerará como ejerciendo ilegalmente la medicina ... a cada persona que, sin poseer una licencia expedida por el Tribunal Examinador de Médicos de Puerto Rico, se anunciare o se hiciese pasar como médico, cirujano, osteópata, practicante, o comadrona, prestare servicios como tales, e interviniere en el tratamiento de enfermedades o defectos físicos, recibiere o no remuneración por tales servicios." 1931 Leyes de Puerto Rico 205, 211.

En 1945, mediante la Ley Núm. 304 de 15 de mayo, el referido artículo fue enmendado, en lo pertinente, de la manera siguiente:

"... se anunciare o se hiciese pasar como médico, cirujano, osteópata, practicante, o comadrona, y que se haga pasar como capacitado para diagnosticar, tratar, operar, o recetar para cualquier enfermedad, dolor, lesión, deformidad, o condición física, reciba o no remuneración por tales servicios. 1945" Leyes de Puerto Rico 115.

Este artículo fue enmendado mediante las Leyes Núm. 97 de 21 de junio de 1961 y Núm. 18 de 24 de abril de 1972 (20 L.P.R.A. sec. 39). En 1980, mediante la Ley Núm. 112 de 4 de junio, se enmendó este artículo de nuevo para cambiar el delito de uno menos grave a grave con la pena que existe hoy día. En ese momento se adoptó un lenguaje similar al que tenemos ahora:

"... escribiere redactare o publicare un aviso o anuncio pretendiendo estar capacitada legalmente para ejercer la medicina o la osteopatía; ofreciere servicios de medicina u osteopatía por medio de algún aviso, anuncio o en cualquier otra forma; y que pretendiere estar capacitado para examinar, diagnosticar, tratar, operar, o recetar para cualquier enfermedad, dolor, lesión, deformidad, o condición física, y/o mental o que lleve a cabo o se ofrezca por cualesquiera medios o métodos para examinar, diagnosticar, tratar, operar, o recetar para cualquier enfermedad, dolor, lesión, deformidad, o condición física y/o mental, reciba o no remuneración por tales servicios." 1980 Leyes de Puerto Rico 392, 398.

Posteriormente, se enmendó en términos generales: Véanse: Ley Núm. 1 de 25 de junio de 1986 (para cambiar el término "osteopatía" por el de "osteología", en cuyo momento alegadamente se dejó fuera inadvertidamente una frase); Ley Núm. 131 de 22 de julio de 1988 (20 L.P.R.A. sec. 39).

que, más bien, define varias modalidades de dicho delito, no sólo no está apoyada realmente por lo que antes habíamos resuelto en *El Pueblo v. Ruiz,* supra, sino que es incompatible con lo que resolvimos en un caso mucho más reciente. En *Pueblo v. Rodríguez,* 91 D.P.R. 721 (1965), concluimos que un quiropráctico había incurrido en el delito de práctica ilegal de la medicina por la *concurrencia de varios elementos.*([2]) Allí dijimos:

> ... [D]e la evidencia documental se desprende que el acusado no es un médico debidamente autorizado a ejercer su profesión en Puerto Rico, y que al firmar el certificado lo hizo haciéndose pasar por médico cirujano en ' el ejercicio de su profesión en Puerto Rico y además que diagnosticó la ausencia de ciertas enfermedades en las personas a favor de quien expidió los certificados. *Pueblo v. Rodríguez,* supra, pág. 726.

En resumen, pues, aunque en ocasiones esta Curia está obligada a estudiar minuciosamente la intención legislativa para tratar de subsanar errores en la redacción estatutaria, un análisis tan *enrevesado* y *controvertible* como el que utiliza la mayoría en esta ocasión para "esclarecer" qué es lo que supuestamente abarca el delito en cuestión, no se ciñe a las restricciones impuestas por el principio de legalidad en casos penales y, ciertamente, no justifica la aplicación de ese análisis de manera retroactiva.([3]) Más bien, el principio de legalidad requiere que en la interpre-

---

([2]) En ese caso se acusó a un quiropráctico de practicar ilegalmente la medicina, por éste haber expedido unos documentos en los cuales certificaba haber examinado a unas personas y haber llegado a la conclusión de que éstas no padecían de locura, epilepsia, idiotez, sífilis o de enfermedad venérea alguna que les impidiera contraer matrimonio.

([3]) La interpretación que proponen los apelantes está también razonablemente apoyada por la redacción del aludido articulado en su totalidad. Nótese que en la Ley de 1931, antecesora de la actual, se enumeraron una serie de prácticas que también constituían delitos menos graves, separadas del delito de' práctica ilegal de la medicina, sujetas a la misma pena. Éstas fueron enumeradas por separado de manera similar a como existen actualmente. Véase 1931 Leyes de Puerto Rico 211.

De ahí surge el texto de la última parte del tercer párrafo del artículo objeto de nuestra consideración, el cual, luego de ser enmendado en varias ocasiones, dispone ahora lo siguiente:

"... Constituirán, además, delito grave sujeto a las penalidades establecidas en el primer párrafo de esta sección las siguientes prácticas:

tación de un estatuto penal que no esté claro, como es el caso del estatuto en cuestión, el juzgador se limite al significado establecido de las palabras, en lugar de adoptar un significado nuevo, deducido del propósito general del estatuto. *Meléndez v. Tribunal Superior*, 90 D.P.R. 656, 659 (1964). Por ello, no es correcto tampoco sostener la condena impuesta a los apelantes por haber practicado la "medicina holística" o "naturopatía", sin licencia, a base de un análisis del significado general de lo que significa la práctica de la "medicina", si ello no surge inequívocamente del texto de la ley que tipifica el delito. Ausente una definición estatutaria clara que prohíba la práctica de la naturopatía, el estatuto tiene que ser interpretado restrictivamente, de la manera más favorable a los acusados. En el caso de autos, como la mayoría ha optado por un curso que desatiende estos principios fundamentales, disiento.

## II

Aparte del problema medular que ya hemos discutido, este caso presenta otros problemas que destacan cuán im-

---

"(1) El uso del título de 'Doctor en Medicina', o de la abreviatura 'M.D.', usada ésta sola, o asociada a otros términos, con el propósito de solicitar pacientes, excepto en los casos de personas que estuvieren legalmente autorizadas para ejercer la medicina en Puerto Rico.

"(2) Anunciarse como especialista o ejercer como tal, sin estar debidamente certificado por el Tribunal Examinador de Médicos conforme a lo dispuesto en la sec. 52d de este título.

"(3) Contratar o emplear a cualquier persona como médico u osteólogo sin estar debidamente autorizado por el Tribunal o cuando se le haya suspendido, revocado o cancelado la licencia.

"(4) Anunciarse como, o usar el título de osteólogo a menos que sea un osteólogo debidamente autorizado a ejercer como tal en el Estado Libre Asociado de Puerto Rico.

"(5) Someter documentos falsos o fraudulentos al Tribunal con el propósito de obtener una licencia de médico, osteólogo o la certificación de una especialidad." 20 L.P.R.A. sec. 39.

Como vemos, un individuo podría razonablemente pensar que si el legislador hubiese querido establecer varias modalidades separadas del delito en la primera parte de este párrafo, lo habría redactado de la misma manera en que redactó la parte antes reseñada, y no en forma de párrafo con frases unidas por una conjunción.

procedente es la actuación de la mayoría en el caso de autos.

En Puerto Rico existe el Tribunal Examinador de Médicos, el cual, dentro de las funciones que le delegó la Legislatura y sujeto al marco normativo que fija su ley habilitadora, es el organismo administrativo especializado encargado de velar por que se presten a nuestros habitantes servicios de salud de la más alta calidad posible. Como parte de sus funciones, el Tribunal Examinador de Médicos tiene la responsabilidad de revisar lo que constituye la práctica general de la medicina, las especialidades y subespecialidades, conforme a los diversos avances tecnológicos y científicos en cada área. *Asoc. Drs. Med. Cui. Salud V. v. Morales*, 132 D.P.R. 567 (1993). Sin embargo, aquí no hemos tenido la oportunidad de conocer la posición oficial del referido organismo, y sus fundamentos concretos, en relación con la cuestión, altamente controversial, de si se requiere una licencia expedida por dicho cuerpo para ejercer la naturopatía.[4] Tampoco formaron parte del proceso habido en instancia otros individuos y grupos con intereses obvios en la cuestión que tenemos ante nos ahora, tales como las personas que ejercen el numeroso y variado grupo de prácticas y supuestas ciencias que se agrupan bajo el término general de la naturopatía;[5] las personas que constituyen la clientela corriente de los distintos tipos de

---

[4] Surge de la exposición narrativa de la prueba que el perito que testificó contra los apelantes, Dr. Boyd Hernández Collazo, ocupa la posición de Asesor Médico del Tribunal Examinador de Médicos. Sin embargo, no surge de ahí que éste participara en el procedimiento criminal en representación de dicho organismo ni que su opinión fuese la formulada por dicho organismo.

[5] No todos los naturópatas practican la medicina biomagnética ni utilizan imanes en los métodos que emplean. De la propia definición de "doctor en naturopatía" citada por la mayoría, surge que existen naturópatas que utilizan otros métodos sicológicos, fisiológicos o mecánicos que conllevan el uso de plantas, alimentos naturales, hierbas y otros tipos. Los apelantes alegaron, en reconsideración, que otros naturópatas utilizan además los métodos siguientes: manipulación articular, gimnasia, hidroterapia, productos homeopáticos, proteínas, vitaminoterapia, aceites vegetales, frutas y otros. Ello no obstante, el resultado al que llega la mayoría convierte en delito grave la práctica de todos los naturópatas que existen hoy en Puerto Rico, sin distinción ni excepción alguna, y sin haberles dado la oportunidad de ser oídos.

naturópatas, incluyendo aquellos que sólo creen en la sanación del cuerpo mediante métodos naturales tales como las energías propias y las plantas para la salud; el Departamento de Salud; el Departamento de Asuntos del Consumidor; el Colegio de Nutricionistas y Dietistas de Puerto Rico; la Asociación Médica de Puerto Rico; la Asociación de Naturópatas de Puerto Rico; las instituciones educativas que se dedican a la formación de los naturópatas,(⁶) y otros.(⁷) En el caso de autos, lo único que se llevó a cabo fue un proceso criminal contra dos individuos que alegan ser doctores en medicina holística y/o medicina biomagnética, en el cual testificaron únicamente dos agentes encubiertos —quienes se hicieron pasar por clientes de los apelantes e inventaron los padecimientos para ser atendidos por éstos— y un perito médico. Por ello, el caso de autos no es el apropiado para resolver cuáles son los requisitos, si alguno, para ejercer la naturopatía en Puerto Rico. No está ante nos el expediente apropiado para que pasemos un juicio tan tajante sobre este asunto, como el que hace la mayoría en su opinión, que para todos los efectos prácticos convierte en delito el solo ejercer como naturópata en Puerto Rico.

Por otro lado, debemos destacar que no contamos con ninguna política pública formulada por la Asamblea Legislativa en relación con la práctica de la naturopatía. Bajo nuestro sistema de gobierno, el derecho de una persona a ejercer cualquier profesión o negocio que crea conveniente no es absoluto, sino que está limitado por los requisitos y las condiciones que razonablemente imponga la Legislatura en el ejercicio del poder regulador (*police power*) que tiene el Estado, para beneficio de la comunidad. *Asoc. Drs. Med. Cui. Salud V. v. Morales,* supra; *Col. Ing. Agrim. P.R.*

---

(⁶) En Puerto Rico existen al menos dos instituciones de este tipo: el Instituto Paladi y el Seminary College.

(⁷) Surge del alegato del Procurador General que, en ocasión de estudiar un proyecto de ley sobre la reglamentación del ejercicio de la naturopatía, la mayoría de los grupos antes mencionados comparecieron ante el Senado.

*v. A.A.A.*, 131 D.P.R. 735 (1992); *Santiago v. Trib. Exam. de Médicos*, 118 D.P.R. 1 (1986); *Pérez v. Junta Dental*, 116 D.P.R. 218, 233 (1985); *Román v. Tribl. Exam. de Médicos*, 116 D.P.R. 71, 77 (1985). De acuerdo con ello, la Legislatura, luego del debido proceso de deliberación y debate público, podría reglamentar la práctica de la naturopatía en nuestra Isla de manera que se requiera una licencia del Tribunal Examinador de Médicos o de alguna otra junta examinadora para ejercerla; incluso es concebible que pudiera prohibir tal práctica, si hubiese bases y razones adecuadas para ello. Sin embargo, la Legislatura, a pesar de haber tenido ocasión para aprobar tal legislación, ha optado por no hacerlo.[8] No nos corresponde a nosotros, en el estrecho contexto de un caso criminal, por puro fíat judicial, prohibir la naturopatía en Puerto Rico.

## III

Finalmente, estamos de acuerdo con el Procurador General en que el propósito primordial del estatuto en cuestión es penalizar la "usurpación de funciones con carácter eminentemente médico, sin tener la debida autorización" para ello. En el caso de autos, sin embargo, hay razones serias para dudar que tal usurpación haya ocurrido.

Surge de la exposición narrativa de la prueba que los apelantes en este caso no hicieron un examen físico o médico a los agentes encubiertos; sólo los entrevistaron y les hicieron llenar un formulario; no les diagnosticaron ningún padecimiento;[9] no les dijeron que eran médicos; no utili-

---

[8] De hecho, surge de la opinión de la mayoría que la Legislatura, en varias ocasiones, ha optado por no reglamentar la práctica de la naturopatía de manera expresa.

[9] De hecho, la literatura que los apelantes le entregaron a cada agente encubierto dice lo siguiente:

"¿QUE ES MEDICINA HOLISTICA?

"El concepto holístico no define necesariamente una condición específica de una enfermedad. En lugar de ello, trata de fomentar los poderes de sanación natural que todos tenemos, de modo que nos permita activar las fuerzas sicológicas necesarias

zaban el título de "Doctor en Medicina" o de la abreviatura "M.D." como expresa la ley, ni ninguna otra sigla que comúnmente usan los doctores en medicina, y no les recetaron medicamentos.([10]) No existe evidencia en el expediente ante nos de que los apelantes, en el caso de autos, se hicieran pasar por médicos, en el sentido convencional. No queda claro, de modo alguno, que en este caso se haya cometido lo que tradicionalmente constituye el delito de práctica ilegal de la medicina, como no se cometería obviamente cuando algún ministro religioso, digamos, se ofrece como intermediario divino o de fuerza supranaturales para "sanar" al que se siente enfermo.

En una sociedad democrática y pluralista como es la nuestra, es necesario no confundir al embaucador y al impostor con los que ejercen menesteres inusitados, que a algunos nos pueden parecer extraños. Sobre todo, los que ejercemos alguna función de autoridad pública debemos estar siempre vigilantes que en nuestro afán por proteger el auténtico interés público, no lleguemos al extremo del paternalismo, ni que confundamos el bien común con los intereses de algún gremio o elite social.

---

para la curación no importa la enfermedad que padezcamos.

"La medicina holística trata el cuerpo como un todo y no como un conjunto de partes. Atiende la triple salud del cuerpo: la salud mental, física y espiritual (nuestra energía)."

([10]) En su testimonio, el propio perito de El Pueblo admitió que, aunque la hoja de recomendaciones que los apelantes le entregaron a los agentes encubiertos contenía los elementos de una receta, los apelantes recomendaron únicamente el uso de vitaminas y minerales que se pueden conseguir en cualquier farmacia sin receta médica. De hecho, en su alegato, el Procurador General define la naturopatía como un "sistema terapéutico que no utiliza fármacos ni cirugía, tratando las enfermedades agresivamente con medios naturales".