Opinión concurrente y disidente emitida por la
Juez Aso-ciada Señora Rodríguez Rodríguez.
Concurro con la determinación de este Tribunal de re-chazar la interpretación rígida y formalista esgrimida por el foro apelativo intermedio sobre el delito de maltrato en-tre pareja, tipificado en la Ley para la Prevención e Inter-vención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989 (Ley 54). En consecuencia, procede, como se dictamina, reinstalar el fallo emitido por el Tribunal de Primera Instancia.
HH
En el caso de epígrafe el Tribunal de Apelaciones revocó el fallo condenatorio del recurrido, porque concluyó que el pliego acusatorio presentado era insuficiente al carecer de unos de los elementos del delito maltrato según dispuesto en la Ley 54.(1) El Tribunal de Apelaciones sostuvo que la *1035 Fiscalía erró ál alegar en la acusación que “las partes ha-bían sostenido relaciones sexuales íntimas”,(2) cuando de-bió haber dicho que se trataba de “una relación consensual íntima”, por exigencia, supuestamente, del Art. 3.1 de la Ley 54, 8 L.P.R.A. sec. 631. Según este fundamento, el foro apelativo revocó la condena del acusado.
En Pueblo v. Roldán López, 158 D.P.R. 54 (2002), deter-minamos que los elementos del delito tipificado en el Art. 3.1 eran los siguientes: primero, el empleo de fuerza física o violencia psicológica, intimidación o persecución; se-gundo, empleo de fuerza contra una persona que haya sido cónyuge del agresor o agresora, o con quien haya convivido, sostenido una relación consensual, o procreados hijos, y tercero, que la fuerza o violencia se haya efectuado para causar daño físico a esa persona o a sus bienes.
Por otro lado, la Regla 35(c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, regula lo concerniente al contenido de la denuncia y de la acusación. Esta regla impone dos exigen-cias, en primer término, que se incluyan todos los elemen-tos esenciales del delito imputado y, segundo, que se utilice un lenguaje al alcance de la comprensión del ciudadano promedio. El propósito de la regla es informar al acusado del delito que se le imputa de forma tal que pueda prepa-rar su defensa de manera adecuada. No hemos requerido que se empleen “estrictamente las palabras usadas en la ley y podrá emplear otras que tengan el mismo significado”. (Énfasis nuestro.) Pueblo v. Calviño Cereijo, 110 D.P.R. 691, 693-694 (1981). No se requiere por lo tanto, “seguir *1036 ningún lenguaje estereotipado ... o talismánico”. (Énfasis nuestro.) Id.
En Pueblo v. Meléndez Cartagena, 106 D.P.R. 338, 341 (1977), nos reiteramos en lo anterior indicando que “[l]a Regla 35(c) de Procedimiento Civil no exige que la acusa-ción siga fielmente las palabras de la ley. Su propósito no es cumplir mecánicamente con una forma ritual, sino in-formar al acusado el delito que se le imputa, de tal suerte que pueda preparar adecuadamente su defensa.” (Énfasis nuestro.) Lo importante es que el acusado pueda entender de qué se le acusa. Pueblo v. Calviño Creijo, ante, pág. 694. Igualmente, hemos sostenido que la Regla 35(c) debe ser interpretada con liberalidad. Pueblo v. Villafañe, Contreras, 139 D.P.R. 134 (1995).
Debemos puntualizar que todo derecho, incluyendo el derecho penal, requiere interpretación. La interpretación comienza por el texto de la ley, “el cual tiene que ser enten-dido de acuerdo con el uso del lenguaje común, especial y sobre todo jurídico-penal.” E. Mezger, Derecho Penal, Bue-nos Aires, Eds. Valleta, 2004, T. 1, pág. 39. Así, el Art. 13 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4641, en su primer párrafo ordena: “[l]as palabras y frases se inter-pretarán según el contexto y el significado sancionado por el uso común y corriente.” Este mandato recoge la llamada interpretación gramatical, la cual “aunque de un grado inferior de la interpretación” —L. Jiménez de Asúa, La ley y el delito: principios del derecho penal, 13ra ed., Buenos Ai-res, Ed. Sudamericana, 1984, pág. 112— cumple una mi-sión importante porque el legislador “muchas veces emplea términos que tienen un doble significado ....” F. Muñoz Conde, Introducción al Derecho Penal, 2da ed., Montevideo, Ed. B de F, 2001, pág. 218.
Antes bien, el maestro Jiménez de Asúa nos indica que no es suficiente la interpretación gramatical, sino que el juez deberá “valerse armónicamente” del medio teleológico. Jiménez de Asúa, op. cit. Mediante esta regla de interpre- *1037 tación es que “mejor [se] descubre la íntima significación de los preceptos, la verdadera voluntad de la ley, deduciéndola, no sólo de las palabras, sino de los múltiples elementos que contribuyen a formar las disposiciones legislativas”. íd., pág. 113. Este método de interpretación se recoge en el úl-timo párrafo del Art. 13 del Código Penal, donde se dispone: “Si el lenguaje empleado es susceptible de dos o más inter-pretaciones, debe ser interpretado para adelantar los propó-sitos de este Código y del artículo particular objeto de interpretación.”
En la interpretación teleológica, el criterio del bien jurí-dico protegido por la ley interpretada, “juega un impor-tante papel”. Muñoz Conde, op. cit., pág. 230. Este meca-nismo de interpretación “se fuerza en orientar la atención hacia el bien jurídico tutelado por la norma y, por tanto, hacia el fin concreto”. Id. Ello supone una interpretación dinámica que adapte la ley a “las exigencias de la vida del presente .... Dado que se debe averiguar la voluntad de la ley y no sólo la voluntad del legislador ....” Mezger, op. cit. O, en palabras de profesor Muñoz Conde, “estableciendo una conexión entre el momento en que nació la ley y el momento en que se aplica, entre el ayer y el hoy”. Muñoz Conde, op. cit., pág. 231. Véanse también: D. Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, 6ta ed., Ed. Inst, para el Desarrollo del Derecho, 2010, págs. 113 — 114; D. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, San Juan, Ed. Inst, para el Desarrollo del Derecho, 2008, pág. 17.
¿Qué valor tutela la Ley 54? Comprender su verdadero alcance y adquirir conciencia de su justicia, son necesida-des de primer orden para asegurar, primero, la correcta aplicación de esta norma, y segundo, que esa aplicación sea igual para todos, esto es, “acorde con el postulado de segu-ridad jurídica”. E. Ramón Ribas, Violencia de género y vio-lencia doméstica, Valencia, Ed. Tirant lo Blanch, 2008, págs. 39-40.
*1038 II
No hay duda de que la Ley 54 pretende proteger la in-tegridad física y dignidad de las mujeres víctimas de vio-lencia doméstica. La violencia contra las mujeres es un fe-nómeno mundial que ha requerido atención a nivel global. Tal es así que las Naciones Unidas, en la Conferencia Mun-dial sobre los Derechos Humanos celebrada en Viena en 1993, aprobó la Declaración sobre la eliminación de la Vio-lencia contra las Mujeres, la que definió como: “Todo acto de violencia basado en la pertenencia al sexo femenino que produzca o pueda producir a las mujeres daño o sufri-miento físico, psicológico y sexual, incluidas las amenazas, la coacción o la privación arbitraria de libertad que ocu-rran en la vida pública o privada. ... [Es] una manifesta-ción de las relaciones de poder históricamente desiguales entre el hombre y la mujer que han conducido a la domi-nación de la mujer y a la discriminación en su contra por parte del hombre.” Declaración sobre la Eliminación de la Violencia contra la Mujer, Asamblea General de la Organi-zación de las Naciones Unidas, 20 de diciembre de 1993 (ONU 1993).
La violencia en la relación de pareja se ejerce para man-tener y reforzar la relación de dominación de un colectivo sobre otro. Se trata de un tipo de violencia asociada direc-tamente a la “discriminación estructural de un determi-nado grupo social, a la posición de subordinación que ocu-pan sus integrantes en el contexto comunitario”. P. Laurenzo Copello, “La violencia de género en el derecho penal: un ejemplo de patemalismo punitivo”, en P. Lau-renzo Copello, M. Luisa Maqueda y A. Rubio (coordinado-ras), Género, violencia y derecho, Buenos Aires, Eds. del Puerto, 2009, pág. 276. Esta violencia se expresa “median-te conductas y actitudes basadas en un sistema de creen-cias sexista y heterocentrista, que tiende a acentuar las diferencias apoyadas en los estereotipos de género, conser- *1039 vando las estructuras de dominio que se derivan de ellos”. J. Corsi, La violencia en el contexto familiar como problema social, en J. Corsi (compilador), Maltrato y abuso en el ám-bito doméstico: fundamentos teóricos para el estudio de la violencia en las relaciones familiares, Buenos Aires, Ed. Paidós, 2003, pág. 18.
Dicho de otra forma, “la violencia en la relación de pareja se alimenta de las visiones y los roles estereotipados que promueven la subordinación de las mujeres ...”. E. Vicente, Interpretación Discriminatoria y Odiosa, www.derechoal derecho.com. Con lo cual, no es difícil concluir que la violen-cia en la pareja la sufre la mujer por el hecho de ser mujer. No por pertenecer a este sexo, no por los rasgos biológicos que las distinguen de los hombres, “sino por los roles subor-dinados que le asigna la sociedad patriarcal”. Corsi, op. cit. Ello precisamente obliga a concluir que la violencia en la pareja, conceptualizada desde la perspectiva de género, nos habla de la violencia contra las mujeres como una forma de discriminación que, para minimizar su impacto, precisa de acciones positivas por parte del Estado, tal como la Ley 54. “La Ley Número 54 ... se diseñó, se redactó, se defendió y se promulgó con el propósito expreso de proveer protección a la vida, a la seguridad y a la dignidad de las sobrevivientes de violencia en la relación de pareja. No se adoptó para prote-ger a la familia. Tanto es así que los remedios que provee garantizan el desalojo del agresor y su arresto inmediato, sacándolo así de la vida familiar que la conducta violenta ya ha destruido.” Vicente, supra.
La Ley 54 tutela entonces, como primer valor, la protec-ción de la integridad física y sicológica de la persona que se encuentra sumida en una relación de subordinación y que sufre sus consecuencias. Pero el bien jurídico protegido trasciende y se extiende más allá de la protección de la integridad física y psíquica. El maltrato mental y físico, y las vejaciones que sufre la mujer en la relación de pareja, son contrarios a los valores constitucionales de primer or- *1040 den como el derecho a la dignidad de la persona, al libre desarrollo de su personalidad y el derecho a no ser discriminado. Estos son entonces, como corolario lógico, bienes jurídicos tutelados también por la Ley 54. En este tenor se ha sostenido lo siguiente: "... el clima mismo en que se contextualiza la relación típica determina que el objeto de protección desborde la mera contemplación de la situación de riesgo para entroncar con conceptos más am-plios de dignidad, bienestar, seguridad y tranquilidad, cuya tutela supera la contemplación aislada de los resulta-dos lesivos que eventualmente llegaran a producirse.” (En-fasis y escolio omitidos.) C. Gómez Rivero, Algunos aspec-tos del delito de malos tratos, 6 Revista Penal 67, 71 (2000).
III
Al trasladar al asunto que nos convoca los principios discutidos es razonable concluir que, en efecto, la relación sexual íntima está contemplada en el delito de maltrato del artículo 3.1 de la Ley 54, cuando allí se habla de rela-ción consensual. Esta interpretación es la que nos permite interpretar la ley como un todo y permite hacer efectivo el bien jurídico tutelado por la Ley 54.
La Ley 54 pretendió abrigar bajo su manto de protección algo más que una agresión física y algo más que la violen-cia que se suscita en la relación entre cónyuges. Véase E. Vicente, Beyond Law Reform: The Puerto Rico Experience in the Construction and Implementation of the Domestic Violence Act, 68 Rev. Jur. U.P.R. 553 (1999). Es por ello que la ley no distingue entre personas casadas o no casadas entre sí; no importa tampoco que la víctima y el agresor estén separados o viviendo juntos, ni si están divorciados, ni si sostienen, en efecto, una relación consensual, bas-tando con que la hayan sostenido; como ciertamente no importa que estén casados con otra persona al momento de *1041 su relación. A fin de cuentas, la Ley 54 pretendió cobijar distintas relaciones íntimas de la pareja donde se susciten incidentes de violencia doméstica.
En ese contexto, sostener, como hace el Tribunal de Ape-laciones que hablar de una relación consensual en el con-texto de la Ley 54 es algo distinto a una relación sexual para efectos de ésta es, a mi juicio, irrazonable. Ambas, necesariamente, hablan de lo mismo y se refieren a una relación íntima establecida por el consentimiento de am-bas partes. Esa relación sexual supone una relación consensual íntima. Esta interpretación es la que permite, en el contexto de la Ley 54, impartirle un significado a la letra de la Ley que sea cónsono con su propósito y que sirva para adelantar sus objetivos. Lo cierto es que la protección está allí dispuesta, el “problema” reside en la utilización de una descripción inadecuada. Jiménez de Asúa, op. cit., pág. 117. “El juez moderno no crea el Derecho, pero sí ejerce función creadora. Las leyes yacen inertes, flácidas, y el juez, a vir-tud del proceso de subsunción, las vitaliza.” íd., pág. 120.
Tomando en cuenta lo que ya hemos indicado previa-mente, de que la Regla 35(c) de Procedimiento Criminal, supra, no requiere la utilización de palabras mágicas, sino que lo importante es que el acusado entienda el delito que se le imputa y que la interpretación del delito y su texto debe adelantar el objetivo de la Ley 54, es evidente que la acusa-ción en el caso de epígrafe sí imputaba el delito descrito en el Art. 3.1 de la Ley 54, por lo que fue un error desestimarla y revocar la convicción del recurrido. La posición que asumió el foro apelativo me parece, como poco, desatinada. Por ello, estoy conteste con la determinación de este Tribunal de re-vocarla y reinstalar el fallo condenatorio emitido por el Tribunal de Primera Instancia contra el señor Pérez Feliciano por infracción al Art. 3.1 de la Ley 54.
*1042 IV
De ordinario, nuestras expresiones hubiesen concluido aquí. Ahora bien, la referencia en la sentencia dictada hoy por el Tribunal a Pueblo v. Flores Flores, 181 D.P.R. 225 (2011), me impone la obligación de plasmar mi rechazo con tal proceder. Me explico.
De entrada, debemos apuntar que es norma trillada de adjudicación que, de ordinario, no procede citar sentencias de este Tribunal, pues como sabemos éstas no sientan pre-cedente por lo que es impropio invocarlas. La escueta sen-tencia dictada en Flores Flores, ante, provocó sendas opi-niones de conformidad y disidentes. Hoy, la mayoría cita con aprobación, tal cual fuera la opinión del Tribunal, ex-presiones de la de conformidad dictada en Flores Flores, ante. Sin más, esto me parece, jurídicamente, impropio.
Pero nos provoca mayor consternación el hecho de que con esa referencia la mayoría parece validar una posición doctrinal desacertada e insensible. Véanse, entre otros: E. Vicente, Interpretación Discriminatoria y Odiosa, www.derechoalderecho.com; E. Fontánez Torres, Mujeres A, www.poderespacioyambiente.blogspot.com; E. Fontánez Torres, La obligación de los jueces del Supremo no incluye imponer(nos) su propio código de moralidad, www. poderyambiente. blogspot.com.
Como sabemos, en Flores Flores, ante, el dictamen emi-tido negó la protección de las disposiciones de la Ley 54 a una mujer por el hecho estar casada cuando sostuvo rela-ciones íntimas con su agresor, entonces su pareja. Sin duda, la determinación del Tribunal en Flores Flores, ante: "... constituye un tortuoso malabarismo que maltrata y la-cera una pieza legislativa que ha provisto remedios a miles de personas agobiadas por la violencia en la pareja. Tam-bién agrede el derecho a la igual protección de las leyes y discrimina contra un sector de la sociedad puertorriqueña — las mujeres sobrevivientes de violencia doméstica en *1043 una relación de pareja con un hombre distinto al marido o quien está casado con otra mujer. ... Se trata de una deci-sión discriminatoria y odiosa. Discriminatoria porque se ensaña con un sector de la población que no se acomoda a la visión tradicional del tipo de relación de pareja que te-nemos derecho a formar en Puerto Rico. Odiosa, porque abona al clima de prejuicio que aún se respira en esta Isla contra las mujeres que se alejan del mandato fundamenta-lista de ser hija-madre-esposa abnegada y subordinada.” Vicente, ante.
El dictamen en Flores Flores y la opinión de conformi-dad, a mi juicio, traslucen una lamentable incomprensión sobre qué es la violencia doméstica/en la pareja/machista/ contra las mujeres y el valor que tutela la Ley 54. Esta ausencia de un constructo jurídico válido sobre el cual ha-cer descansar los dictámenes suscritos, pudiera explicar, aunque no justificar, los profundos errores en que incurre. Por lo que es lamentable que hoy se invoque con aproba-ción lo allí señalado.
Indicamos previamente que la Ley 54 tutela, como valor primario, la protección de la integridad personal de aquéllas que sufren una agresión por parte de sus parejas. Ello, no obstante, la opinión de conformidad citada con aprobación yerra al procurar identificar el valor tutelado por la ley.
Allí se sostiene que el bien tutelado es “la institución familiar”. Lo que da pie a negarle protección a la mujer en ese caso, ya que su agresión la sufrió mientras mantenía una relación con el agresor estando ella casada con otra persona. Y se razonó que ya que el adulterio está tipificado como delito y este delito atenta, precisamente, contra la integridad de la “unidad familiar”, no procede extender la protección reclamada según la Ley 54 a la mujer adúltera. A las que han venido a llamar: “Mujeres A.”(3)
Aseverar que el bien tutelado por la Ley 54 es la inte- *1044 gridad de la unidad familiar es lo mismo que concluir que quien sufre la lesión es la familia. Según esta visión, los casos de violencia doméstica lo que plantean es un pro-blema de naturaleza familiar y, por lo tanto, de carácter privado. “Las referencias a la institución familiar como ob-jeto de tutela abonan, ... [a] la idea de que el maltrato que sufren las mujeres a manos de sus parejas constituye un problema, en tanto doméstico, esencialmente privado.” Ra-món Ribas, op. cit, pág. 33. Véase, también, R Laurenzo Copello, La violencia de género en la Ley Integral. Valora-ción político-criminal, Núm. 07-08 Rev. Electrónica de Ciencia Penal y Criminología 7 (2005). Postura peligrosa, pues sirve para fomentar “uno de los prejuicios culturales que en mayor medida han obstaculizado la persecución de la violencia de género, convirtiéndola en un asunto de fa-milia que el propio grupo está llamado a resolver”. Id.
La doctrina científica, sin embargo, rechaza el enfoque expresado en Flores Flores. Esta sostiene que, en la actua-lidad, la institución familiar “admite diversas modalidades (e, incluso, que es reciente la aparición de nuevas formas familiares), por lo que su protección no persigue conservar un determinado modelo de familia sino, encerrando ésta un entramado de derechos y deberes entre sus miembros ... cuya función, en suma, no es proteger la familia en sí, sino determinadas relaciones jurídicas nacidas en su seno”. (En-fasis nuestro.) Ramón Ribas, op. cit., págs. 59-60. Véase, además en igual sentido, J. Ramos Vázquez, La problemá-tica del bien jurídico protegido en los delitos de malos tra-tos ante su (pen)última reforma, 9 Anuario da Falcultades de Dereito da Universidades da Coruña 746-747 (2005) (“la protección de un bien jurídico como la familia tout court o la paz y la convivencia familiar supone una intolerable violación del principio de intervención mínima, amén de plantear numerosos problemas, dada su inconcreción”); P. García Alvarez y J. del Carpió Delgado, El delito de ma-los tratos en el ámbito familiar. Problemas fundamentales, *1045 Valencia, Ed. Tirant lo Blanch, 2000, pág. 23 (“resulta du-doso que la familia pueda ser concebida como valor susceptible de una abstracta tutela penal distinta de la de sus miembros”); N. Castelló Nicás, “Problemática sobre la con-creción del bien jurídico protegido”, en coordinación L. Mo-rillas, Estudios Penales sobre Violencia Doméstica, Madrid, Ed. Cueva, 2002, pág. 67.
De otra parte, en la medida en que los remedios provis-tos por la Ley 54 garantizan la expulsión y separación del agresor del “seno familiar”, nos parece un contrasentido decir que lo que tutela la ley es precisamente la unidad familiar. La profesora Vicente lo expresa de la manera si-guiente, citamos nuevamente: “La Ley Número 54 ... se diseñó, se redactó, se defendió y se promulgó con el propó-sito expreso de proveer protección a la vida, a la seguridad y a la dignidad de las sobrevivientes de violencia en la relación de pareja. No se adoptó para proteger a la familia. Tanto es así que los remedios que provee garantizan el des-alojo del agresor y su arresto inmediato, sacándolo así de la vida familiar que la conducta violenta ya ha destruido.” (Enfasis nuestro.) Vicente, ante.
Antes bien, sabemos que la Ley 54 ofrece protección a aquellas personas que han mantenido una relación de pareja. Y, define la relación de pareja como: “la relación entre cónyuges, ex cónyuges, las personas que cohabitan o han cohabitado, las que sostienen o han sostenido una re-lación consensual íntima y los que han procreado entre sí un hijo o una hija.” (Enfasis nuestro.) 8 L.P.R.A. sec. 602(m). Tomando como válido lo propuesto en la opinión de conformidad de que el bien jurídico tutelado por la Ley 54 es la familia, debemos preguntarnos lo siguiente: ¿a qué familia se protege en los casos que involucren a excónyu-ges, o aquéllos que han cohabitado, o a los que han soste-nido una relación consensual íntima? ¿Lo que se tutela es la familia que constituyeron mientras cohabitaban? ¿Y los que nunca convivieron mas sostuvieron una relación con *1046 sensual íntima, qué? ¿O es que lo que se piensa es que la Ley 54 sólo ofrece protección a quienes conviven, pues sólo éstos constituyen familia? O peor aún, ¿es que la familia a que se refiere el dictamen es aquélla que se estima ideal y correcta en función de una visión personal y moralista so-bre lo de debe ser la familia? Si fuera esto último, nos en-contraríamos en una pendiente escurridiza camino hacia un dirigismo social inaceptable.
El valor tutelado por la Ley 54 no es la unidad familiar. La Ley 54 tutela, como ya dijimos, la protección de la inte-gridad física y sicológica de la persona que se encuentra hundida en una relación de subordinación y que sufre sus consecuencias. Pero también, procura salvaguardar valo-res constitucionales de primer orden como el derecho a la dignidad de la persona, al libre desarrollo de su personali-dad y el derecho a no ser discriminado.
Por todo lo anterior me veo precisada a disentir de la sentencia dictada en aquella parte que procura validar el dictamen en Flores Flores.
V
Al cierre, una última reflexión. Obligada ésta por las expresiones hacia esta opinión disidente.
Como sabemos, no siempre es posible lograr un con-senso o unanimidad al momento de tomar una decisión. Eso es así en la sociedad en general, cuando se toman de-cisiones colectivas y por supuesto, es igual en un cuerpo colegiado como este Tribunal. En el campo que nos ocupa, el Tribunal Supremo de Puerto Rico, la disidencia juega un papel importante que permite validar la propia legitimidad de la institución en la que servimos. Es lamentable que no se aprecie y se valore ese rol.
En el ámbito jurídico, la opinión disidente es el meca-nismo de expresión democrática para quien difiere del cri-terio mayoritario. Esa expresión constituye el ejercicio del *1047 derecho a la libertad de expresión del juez ponente y el Tribunal, como cuerpo, lo debería celebrar y garantizar. Véase S.H. Fuld, The Voices of Dissent, 62 Colum. L. Rev. 923, 926 (1962) (“I am positive that disagreement among judges is as true to the character of democracy, and as vital, as freedom of speech itself. The affairs of government, no less that the work of the courts, could not be conducted by democratic standards without that right of dissent. Indeed, we may remind ourselves, unanimity in the law is possible only in fascist and communist countries”). Pero más importante aún, la expresión disi-dente es una herramienta para validar la legitimidad de una corte de última instancia, como lo es este Foro. Me explico.
Contrario a las otras dos ramas de gobierno, la Rama Judicial, en especial este Tribunal, toma sus decisiones en secreto. La confidencialidad que rodea —y debe rodear— los trabajos de esta Curia hace de ello uno de nuestros imperativos adjudicativos. Así, nuestro proceso de adjudi-cación no se discute públicamente salvo, claro está, cuando se publica nuestro dictamen. Ese elemento misterioso, aunque necesario e imprescindible, es contrario a los prin-cipios sobre los que se asienta la democracia deliberativa e incide, necesariamente, sobre la legitimidad de un Tribunal Supremo. En este rigor entonces, la opinión disidente cumple un rol fundamental porque abre un resquicio a tra-vés del cual observar el proceso deliberativo de los miem-bros de un foro colegiado como éste.
En este sentido, se ha indicado:
[T]he practice of publishing dissenting opinions alongside the opinion of the Court, with notation of which Justices join these opinion exposes the deliberative character of the Court’s decisionmaking. The practice of dissent shows that the formation of the Court’s judgment involves not merely a principled extension of its previous decisions, but an “argumentative interchange” among its current members. ... The publicity of dissenting opinions and the indication of Justices’ individual endorsements of particular opinions reveal that the Justices *1048 do confront each other with their disagreements about matters of principle through the exchange of opinions and the conversation that surrounds them, if not also in their formal conferences. In this way, the practice of dissent manifests the exchange of reasons along the Justices that characterizes their process of desisionmaking; without this practice, those of us outside the Court would have no way to see the Court as embodying a deliberative process of judgment. (Enfasis nuestro.) K. Stack, The Practice of Dissent in the Supreme Court, 105 Yale L.J. 2235, 2257 (1996). Véanse, también: C.R. Sunstein, Why Societies Need Dissent, Cambridge, Harvard University Press, 2003; E Michelman, Conceptions of Democracy in American Constitutional Argument: The Case of Pornography Regulation, 56 Tenn. L. Rev. 291, 293 (1989).
Por otro lado, la opinión disidente contribuye a fortale-cer el criterio mayoritario. Obligan a quien es jurista a mirar su trabajo desde otra perspectiva y con otros ojos para, en consecuencia, atender las debilidades de su fun-damentación afinando su criterio. En este tenor, conviene internalizar lo dicho por la Juez Ginsburg: “My experience teaches that there is nothing better than an impressive dissent to improve an opinion for the Court. A well reasoned dissent will lead the author of the majority opinion to refine and clarify her initial circulation.” R.B. Ginsburg, The Role of Dissenting Opinions, The 20th Annual Leo and Berry Eizenstat Memorial Lecture, 2007. http:// www.supremecourt.gov/publicinfo/speeches/ viewspeeches.aspx?Filename=sp — 10-21-07.html
La disidencia vigorosa no es más que un reflejo de un robusto e independiente Poder Judicial. Se revela así como un detente para quienes intenten neutralizar, controlar o intimidar a los miembros de esta rama de gobierno. Lo que evidentemente redunda en el fortalecimiento de nuestra democracia. Sobre este particular, el Juez Douglas apuntó lo siguiente:
Certainty and unanimity in the law are possible both under the fascist and communist systems. They are not only possible; they are indispensable; for complete subservience to the political regime is a sine qua non to judicial survival under *1049 either system. One cannot imagine the courts of Hitler engaged in a public debate over the principles of Der Führer, with a minority of one or four deploring or denouncing the principles themselves. One cannot imagine a judge of a communist court dissenting against the decrees of the Kremlin .... W.O. Douglas, The Dissent: A Safeguard for Democracy, 32 Journal of Am. Judicature Society 104, 105 (1948), citado en A. Lynch, Dissent: The Rewards and Risks of Judicial Disagreement in the High Court of Australia, 27 Melbourne U.L. Rev. 724, 727 (2003).
El disenso es, parafraseando al Juez Presidente Hughes, un llamado a la inteligencia del futuro para que corrija los errores del pasado. El Juez Scalia considera que las opinio-nes disidentes engrandecen, en vez de desmerecer, el pres-tigio del Tribunal. Y ha explicado lo siguiente: “When history demonstrates that one of the Court’s decisions has been a truly horrendous mistake, it is comforting ... to look back and realize that at least some of the [Jjustices saw the danger clearly and gave voice, often eloquent voice, to their concern.” Citado en Ginsburg, ante.
Disentir es una obligación ínsita a nuestra función de procurar justicia para todos. “[T]he obligation that all of us, as American citizens have, and that judges, as adjudicators, particularly feel, is to speak up when we are convinced that the fundamental law of our Constitution requires a given result. ... The right to dissent is one of the great and cherished freedoms that we enjoy by reason of the excellent accident of our American births.” W.J. Brennan, In Defense of Dissents, 37 Hastings L.J. 427, 438 (1986).
A modo de epílogo diré que la homogenización del pen-samiento ha sido y será un síntoma de una grave enferme-dad: el totalitarismo. Véase H. Arendt, The Origins of Totalitarianism, Nueva York, Ed. Harcourt, 1985. Acallar a la disidencia restándole importancia o valor a sus argumen-tos o, incluso, sugiriendo que estos se esbozan para adelan-tar posturas personales es una forma de violencia simbó-lica que no podemos validar. La democracia no es
*1050 meramente una palabra para ser invocada a conveniencia; la democracia es un compromiso y una promesa que nos exige pronunciarnos en pos de la justicia y la equidad.(4)

 El Art. 3.1 de la Ley Núm. 54 de 15 de agosto de 1989 (Ley 54) define el delito de maltrato de la manera siguiente:
“Toda persona que empleare fuerza física o violencia psicológica, intimidación o persecución en la persona de su cónyuge, ex cónyuge, o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, para causarle daño físico a su persona, a los bienes apreciados por ésta, excepto aquéllos que pertenecen privativamente al ofensor, o a la persona de otro o para causarle grave daño emocio-nal, incurrirá en delito grave de cuarto grado en su mitad superior.” (Enfasis nuestro.) 8 L.P.R.A. see. 631.

 El pliego acusatorio presentado en este caso imputaba violación al Art. 3.1 de la Ley 54 según los términos siguientes:
“El referido acusado de epígrafe, allá para el día 21 de abril de 2009, en Manatí, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de Arecibo; ilegal, voluntaria, maliciosa y con la intención criminal!,] empleó violencia física contra la Sra. Mirelsa Rosado Santiago, con quien ha sostenido relaciones sexuales íntimas, consistente en que le tiró una lata de cer-veza en el rostro causándole una laceración, le habló palabras soeces y la escupió en la cara varias veces.” Petición de certiorari, pág. 4.

 Véase É. Fontánez Torres, Mujeres A, www.poderespacioyambiente. blogspot. com.

 Cierto es que la honestidad intelectual debe ser un deber que esta Curia no puede eludir. En aras de lo anterior, y aunque la ruta de vida de las profesoras Esther Vicente y Érika Fontánez Torres hablan por sí solas, me parece intelectual-mente honesto precisar que la profesora Érika Fontánez Torres no sólo es editora del blog Poder, Espacio y Ambiente www.poderyambiente.blogspot.com y www.derechoalderecho.org, sino que también es Catedrática Asociada de la Escuela de Derecho de la Universidad de Puerto Rico. Enseña los cursos de Derecho Civil Patrimonial y Teoría General del Derecho. Trabaja temas relacionados al Derecho y la Teoría Social, la Sociología y la Teoría General del Derecho; ha hecho investigación socio-jurídica aplicada a los temas de Propiedad, Género, Democracia y Medioambiente. Es abogada colaboradora de la Clínica de Asistencia Legal de la misma Escuela. Además es participante del Seminario en Latinoamérica de Derecho Constitucional y Teoría Política de la Universidad de Yale y autora de numerosas publicaciones. Por su parte, la profesora Esther Vicente es profesora asociada de la Escuela de Derecho de la Universidad Interamericana de Puerto Rico. Enseña cursos de Derechos Humanos, Teoría Feminista, Derecho de Familia, Derechos Reales, De-recho Administrativo, entre otros. Además, en mayo de 2002 obtuvo un Doctorado en Derecho de la Universidad de Londres, en Inglaterra. De igual manera, participó activamente en la redacción de la Ley 54 como miembro del Comité que la elaboró, siendo su participación una fundamental. Asimismo forma parte del Latín American and Caribbean Committee for the Defense of Women’s Rights, the International Planned Parenthood Federation y el Seminario en Latinoamérica de Derecho Cons-titucional y Teoría Política de la Universidad de Yale. Es autora, también, de nume-rosas publicaciones. De más está decir que ambas son destacadas juristas.